William George **BIRNBAUM**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 18035.

United States Court of Appeals Eighth Circuit.

Feb. 16, 1966.

Horace W. Mohn, St. Paul, Minn., counsel appointed by this Court, made argument and filed brief for appellant.

Miles W. Lord, U. S. Atty., Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn., made argument and filed brief for appellee.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

VOGEL, Chief Judge.

Defendant-appellant William George Birnbaum was indicted, tried before a jury and convicted of a kidnapping and transporting in interstate commerce in violation of 18 U.S.C.A. § 1201, for which he was sentenced to serve 25 years' imprisonment. This appeal, brought from the judgment of conviction, is based on two grounds: (1) That a written statement, Government's Exhibit 3, signed by appellant following his arrest by local St. Paul, Minnesota, authorities and following interrogation by an FBI Agent, Paul R. Casey, was inadmissible as evidence and should have been excluded by the trial court; and (2) that the final argument of the Assistant United States Attorney was improper.

Appellant was born at Stevens Point, Wisconsin, on October 10, 1934. He lived practically from his birth with adopting parents in LaCrosse, Wisconsin, although the adopting father died shortly after appellant's first birthday. During his early childhood appellant started on what has become a long history of confinement in juvenile and adult penal institutions as well as confinement in a mental hospital. He was incarcerated in past times

for various reasons not directly relevant to this case.

Appellant had attended school in La-Crosse for part of his eighth grade year. One of his classmates at that time was Cecilia Ann Weisbecker, who will hereafter be referred to by her married name of Mrs. Paul Scott. Sometime during that eighth grade year appellant "fell in love" with Mrs. Scott. When in prison, as he frequently was, appellant would write her, even though his letters were seldom, if ever, answered. When in La-Crosse he would phone her, although she claimed she never saw him or went on any dates with him. Such correspondence apparently continued even after Mrs. Scott's 1955 marriage, which marriage was known to appellant. Either shortly before or shortly after the marriage (probably in 1956) Paul Scott, Mrs. Scott's husband, called on appellant while he was in jail in LaCrosse to order the appellant to quit writing Mrs. Scott and to leave the Scott family alone. Appellant's testimony indicates that he made the following response:

"* * * I just told him—I says, 'I'll run my life and you run yours.' I says, 'I knew the girl way before you knew her and if she wants to correspond with me, that's my business.' I says, 'You can't stop her. You ain't married to her.' [Appellant recalls this conversation as taking place before the Scott marriage.] So that's it."

Appellant was released from the Wisconsin State Prison at Waupun, Wisconsin, on March 17, 1959. Following his release, appellant proceeded to Madison, Wisconsin, where, after reporting to his parole officer, he obtained a room at the local YMCA. On that same day, in violation of his parole, appellant bought a pellet gun and proceeded to LaCrosse by bus. Appellant claims that he had called Mrs. Scott from Madison and that she told him "* * * she wanted to see me,—that she wanted me to come down and see her. * * * She says something about that she was having trouble with her husband, or something—mar-riage difficulty, or something. It was just—something like that." Mrs. Scott denied receiving any such phone call or making any request to see appellant.

Appellant arrived at the Scott home in LaCrosse at about 10:30 p. m. on March 17, 1959. The testimony of appellant and the Scotts varies as to particulars after this point, but it is clear that appellant gained admittance to the Scott home and held the pellet gun on Scott, who had answered the door. Appellant beat Scott with his fists and ordered Scott to come with him in Scott's car. Scott drove and the appellant gave directions while sitting beside Scott on the front seat with the pellet gun. They stopped in Osseo, Wisconsin, after Scott pretended they were out of gas. Upon appellant's orders, they left Scott's car and stole another car which they drove to St. Paul, Minnesota, arriving there at about two o'clock a. m. on March 18, 1959. Neither Scott nor appellant accepted responsibility for deciding to go from Wisconsin into Minnesota. The pair stopped at a St. Paul filling station, according to Scott, to inquire as to an address of a friend of appellant's. While appellant was in the filling station restroom, Scott obtained possession of the pellet gun from the front seat of the car and handed it to the filling station attendant. When appellant returned from the restroom, the attendant pointed the gun at him, whereupon appellant passed out or pretended to pass out. The St. Paul police were called and shortly thereafter arrived to take both Scott and the appellant to the St. Paul police station. The police were not convinced of Scott's story about being kidnapped at that time. The time of arrest was somewhere between 2:00 a. m. and 2:42 a. m. on March 18th.

Believing that it was possible a federal charge was involved, the police called the FBI office. Between 5:30 and 6:00 o'clock a. m. appellant was interviewed at the police station by Paul R. Casey, the FBI Agent referred to. Appellant had not at that time been charged with the commission of any crime. Agent Casey testified that he identified him-

self and showed the appellant his credentials. Casey further testified that he told appellant of his right to an attorney, of his right to refuse to make a statement, and of the fact that any statement he made could be used against him. Appellant advised Casey that he did not wish for counsel. Thereupon, Agent Casey took from appellant a statement,[1] Government's Exhibit 3, which was received into evidence at the instant trial. The use of this statement is the basis for appellant's first claim of error.

The long delay in having appellant actually tried and sentenced is best explained by presenting a chronological procedural history of the case beginning with appellant's arrest on March 18, 1959, and ending with this appeal.

1. March 18, 1959. Appellant was brought before William H. Eckley, United States Commissioner, and upon Agent Casey's complaint was ordered arrested for kidnapping Scott. Appellant duly waived preliminary examination.

2. March 23, 1959. Appellant appeared in United States District Court before Judge Dennis F. Donovan at St. Paul, Minnesota. Upon the recommendation of the United States Attorney that counsel be appointed for the appellant in spite of his expressed wish to the

---

1. Appellant's statement is as follows:

"St. Paul, Minn.
March 18, 1959

"I William George Birnbaum hereby make the following voluntary statement to Paul R. Casey, Special Agent of the Federal Bureau of Investigation. No threats or promises of any kind have been made to me to induce me to make this statement and I have been advised that this statement can be used as evidence against me in court. I have been advised of my right to counsel but I do not desire to have an attorney present when this statement is made.

"I was born on October 10, 1934, at Stevens Point, Wisconsin, and had an 8th grade education. I have been serving time in Wisconsin juvenile corrective and adult penal institutons for the past 14 years.

"I met Cecelia Weisbecker in 1940 when we were kids and fell in love with her. After I went to prison I kept writing to her. On May 20, 1955 while I was in the County jail at LaCrosse for breaking and entering Paul Scott visited me at the jail and told me to quit writing to Cecelia who was now his wife. I got sore about it and decided something would have to be done about him, that he would have to go. I have been planning since 1955 to kill him. I kept track of his whereabouts through friends.

"I was released on parole at 9:45 a.m. yesterday morning March 17, 1959 and went immediately to the parole officer at Madison. I reported to the Parole Officer and then went to Montgomery Wards in Madison and bought an air pistol for 15 or 16 dollars. I had a room, 211, at the YMCA and went to my room and tried out the pistol on a chair, shooting through the plywood bottom.

"I left Madison by bus about 5:45 p.m. and got into LaCrosse about 9:15 p.m. and took a cab directly to Scotts house. I went to the back door and knocked. Scott opened the door and I walked in and said I want to see your wife. He shoved me and said 'You can't come barging in here'. I hit him with my fist and knocked him down. I put the gun on him and told him to put on his coat, we were going for a ride. We left the house and got in Scotts station wagon. I told him to go north. I intended to go to Cumberland to pick up some guns at Joseph Vennie's home. Vennie's dead but his wife has the guns.

"On the way we got low on gas, parked the station wagon at a town on the way. I think the town was Pigeon Falls. I made him steal a car with the keys in it. He drove this car to St. Paul. We stopped at a filling station and he went to the rest room. I left the gun on the seat and followed him. He came out and while I was in the rest room got the gun and gave it to a guy who put it on me when I came out of the rest room. Then the Cops came and arrested me.

"I have read the foregoing Statement and it is true and correct.

/s/ William G. Birnbaum
Witness: /s/ Paul R. Casey, Special Agent
F.B.I. Minneapolis 3/18/59
/s/ Louis H. Burg, Det. Lieut.
St. Paul Police Dept."

contrary, the court appointed Harrison P. Dilworth, III, of St. Paul, to represent appellant. The court further directed, also on the recommendation of the United States Attorney, that a psychiatric examination be made of appellant. Arraignment was continued until March 30, 1959.

3. March 24, 1959. Judge Donovan ordered that appellant be examined as to his mental competency by Dr. Ernest M. Hammes, Sr., of St. Paul. Dr. Hammes was directed to report in writing as to the mental condition of the appellant.

4. March 30, 1959. Appellant appeared in District Court before Judge Donovan with his appointed counsel, Mr. Dilworth. A copy of Dr. Hammes' report of his examination of appellant had been made available to appellant. Dr. Hammes' conclusion was:

"The mental examination showed the following: He was well oriented as to time and place, and person. He gave a well connected history. There were no delusions or hallucinations. He knows the difference between right and wrong and the justice in punishment.

"It is my opinion that he is not suffering from a mental illness or neurosis, but that he is a psychopathic personality type. He gives a rather vague history of his blackout spells; however, they do not suggest typical epileptic seizures and bear no relation to his various illegal acts. He is mentally competent to stand a trial and to defend himself in Court.

"I do not think it is necessary to make an electroencephalogram."

Appellant waived indictment by a grand jury. An information was filed, to which appellant entered a plea of not guilty.

5. April 1, 1959. Appellant appeared in District Court before Judge Donovan with his counsel. Consent was granted to appellant's request to withdraw his not guilty plea and to enter a plea of guilty. Appellant was sentenced to 25 years' imprisonment, with a recommendation that he be confined at the United States Medical Center for Federal Prisoners at Springfield, Missouri.

6. January 20, 1960. A grand jury indictment was returned charging the appellant with a violation of the kidnapping law, 18 U.S.C.A. § 1201. The necessity for such an indictment issued after appellant's April 1, 1959, conviction will be shown by the events of May 24, 1960, set out at No. 9, infra.

7. May 23, 1960. Upon motion by the Assistant United States Attorney, Judge Donovan ordered a mental examination of the appellant to be made by Dr. John Dickinson, M.D., the staff psychiatrist at the Springfield Medical Center. Mr. Dilworth was relieved as appellant's counsel and Robert W. Patterson, of St. Paul, was appointed in his place.

8. May 23, 1960. A United States Commissioner for the Southern Division of the Western District of Missouri, Axie Powell, ordered appellant temporarily committed to the Springfield Medical Center for purposes of examining as to appellant's mental competence.

9. May 24, 1960. Upon motion of the United States Attorney, Judge Donovan issued an order declaring appellant's judgment and conviction void and setting the same aside. He reasoned, on the authority of Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041, that in a capital offense case (herein kidnapping), pursuant to Rule 7(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., a grand jury indictment was necessary and appellant's waiver thereof was void.

10. January 4, 1961. Commissioner Powell issued an order for the final commitment of the appellant to the Springfield Medical Center. Appellant consented to his removal to the District of Minnesota.

11. January 16, 1961. On motion of the United States Attorney, Judge R. C. Bell of the District of Minnesota ordered that a mental examination be conducted

of appellant by Konstantin Geocaris, M. D., St. Paul, at government expense.

12. January 16, 1961. Judge Donovan relieved Robert W. Patterson as appellant's counsel and reappointed Mr. Dilworth.

13. January 20, 1961. Appellant and his counsel appeared before Judge Bell in St. Paul and a sanity hearing was held. Exhibits included medical reports prepared by Dr. Dickinson, Dr. Geocaris and Dr. Bernd Silver of the Springfield Medical Center. Dr. Hammes' report was also made available to the court. Dr. Geocaris testified at the hearing.

14. January 27, 1961. Judge Bell issued findings of fact and an order declaring appellant mentally incapable of standing trial. Judge Bell stated:

"William George Birnbaum * * is presently insane and otherwise so mentally incompetent as to be unable to understand the proceedings against him or to properly assist in his own defense of the charges pending against him * * *.

"If released, William George Birnbaum probably will endanger the safety of officers, the property, or other interests of the United States.

* * * * * *

"It Is Hereby Ordered: that the defendant, William George Birnbaum, be committed to the custody of the Attorney General of the United States * * *.

"It Is Further Ordered: that in the event defendant is ever to be released from custody, that the defendant be brought before this Court forthwith for further proceedings."

15. January 31, 1961. Appellant was committed to the Springfield Medical Center pursuant to 18 U.S.C.A. § 4246.

16. December 14, 1964. At the request of the psychiatric staff of the Springfield Medical Center and upon motion of the United States Attorney, Judge Earl R. Larson of the District of Minnesota issued an order for a mental examination of appellant and for a report to be made thereof. A sanity hearing was also set.

17. January 11, 1965. Judge Larson appointed George C. McPartlin of St. Paul as counsel for appellant.

18. January 11, 1965. Chief Judge Edward J. Devitt of the District of Minnesota signed an order directing issuance of a writ of habeas corpus ad prosecundum to bring appellant to St. Paul.

19. February 16, 1965. Appellant and his counsel appeared before Judge Larson and a sanity hearing was held. Testimony was presented by appellant and by Dr. Louis L. Flynn of St. Paul, the psychiatrist who had examined appellant pursuant to the court order of December 14, 1964. 1964 medical reports from the Springfield Medical Center indicating " * * * that the patient [appellant] can presently understand the charges against him and assist counsel in his defense" were entered as exhibits.

20. February 17, 1965. Judge Larson issued findings and an order concluding " * * * that defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and that he has a rational as well as factual understanding of the proceedings against him". Appellant was ordered to stand trial.

21. April 21–23, 1965. Appellant was tried by a jury and found guilty of kidnapping as charged.

22. May 3, 1965. Appellant was sentenced by Judge Larson and committed to the custody of the Attorney General for 25 years. Appellant was made " * * * eligible for parole at such time as the Board of Parole shall determine".

23. May 3, 1965. A notice of appeal was issued seeking a reversal of appellant's conviction, which appeal is that involved herein. On this appeal appellant is represented by Horace W. Mohn, of St. Paul.

## ADMISSION OF APPELLANT'S CONFESSION INTO EVIDENCE

In support of his claim that it was error to receive in evidence the written statement given to Agent Casey on the early morning of March 18, 1959, appellant sets forth three separate contentions of legal error. These will be dealt with individually below.

Appellant's first contention is that, at the time he was interviewed by Casey, he was entitled to counsel and that he did not competently and intelligently waive his right to counsel prior to signing the incriminating statement. In support of this contention appellant cites the landmark decision of Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. We hold that neither point is well taken—i. e., appellant was not necessarily entitled to counsel at the time of the investigation as a matter of constitutional right and, even if he were, he was capable of and did waive such right to counsel.

In *Escobedo*, the Supreme Court stated at pages 490–491 of 378 U.S., at page 1765 of 84 S.Ct.:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an oportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 [83 S.Ct. 792, at 795, 9 L.Ed.2d 799],

and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

The court concluded as follows at page 492 of 378 U.S., at page 1766 of 84 S.Ct.:

"* * * We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

This court, in the recent case of Miller v. United States, 8 Cir., January 5, 1966, 354 F.2d 801, has stated the following in regard to the Escobedo principle at page 812 of 354 F.2d:

"* * * Thus, at least under present law *Escobedo*, which deals with the question of *when* the right to counsel attaches, appears to be limited to certain factual situations not analogously present in the instant case. Of course, there is obviously much disagreement in the application of *Escobedo*, itself a 5 to 4 decision, and perhaps there are nearly as many different interpretations as there are state and federal courts who have attempted to pass upon the question. Compare, e. g., [United States ex rel.] Russo v. [State of] New Jersey, 3 Cir., May 20, 1965, 351 F.2d 429, with United States v. Robinson, 2 Cir., November 22, 1965, 354 F.2d 109. However, any extension of when the right to counsel attaches should not be automatically granted in the light of a strong policy to enforce an effective system of criminal justice. One's Sixth Amendment right to counsel cannot be taken lightly, but each decision must depend on the facts of the case therein involved.

"This court, in Hayes v. United States, 8 Cir., 1965, 347 F.2d 668, 669–670, noted that the Supreme Court has not established an absolute

rule that a confession made without counsel violates Sixth Amendment rights under all circumstances. Judge Blackmun, speaking for this court in Mitchell v. Stephens, 8 Cir., November 24, 1965, 353 F.2d 129, again emphasizes the view that *Escobedo* must, in some degree, be limited to its facts. He states:

> 'We therefore do not believe that the holding in *Escobedo* has a factual parallel or effective application here. If Mitchell's rape confession was the product of coercion and hence was inadmissible, this will be due to other factors and other aspects and not to fundamental unfairness because of the absence of counsel at the confession.' "

See, also, Mitchell v. Stephens, 8 Cir., 1965, 353 F.2d 129, 141–142; United States v. Robinson, 2 Cir., November 22, 1965, 354 F.2d 109, 114–115; United States v. Cone, 2 Cir., November 22, 1965, 354 F.2d 119, 125; Hayes v. United States, 8 Cir., 1965, 347 F.2d 668, 669–670.

We do not feel that the limited holding in *Escobedo* covers the instant situation. At the time Agent Casey interviewed the appellant no charge had been lodged against him. As already indicated, the authorities had some doubts as to the veracity of Scott's claim of being kidnapped. Scott was arguably as much a suspect herein as was the appellant since Scott also was interviewed by Casey after spending the night in jail. Scott had also waived his right to counsel and had signed a written statement. In *Escobedo*, on the other hand, there was no doubt that a murder had been committed and that the focus was on Escobedo as the perpetrator of that crime. Herein Agent Casey was merely attempting to ascertain the facts to see if they indicated that a federal crime had been committed.

The *Hayes* decision, supra, also involving a kidnapping conviction under 18 U.S.C.A. § 1201, is factually very similar to the instant case. Therein, as here, the accused had been advised of his right to counsel before making any statement. The accused in *Hayes* refused the assistance of counsel, as did the appellant herein. In both cases the evidence indicates the confessions were made voluntarily with no desire to have counsel present. See, also, Redmon v. United States, 9 Cir., January 18, 1966, 355 F.2d 407. This situation is radically different from *Escobedo*, wherein the defendant was refused the right to see his retained counsel, although said counsel was at the police station trying to see his client.

Counsel for appellant, assuming arguendo that appellant did have a constitutional right to counsel before signing any statement, argues that appellant was mentally incompetent to waive his constitutional right to such counsel. Such a waiver apparently did take place.[2] Appellant and his counsel rely on evidence presented at the sanity hearing of January 20, 1961, before Judge Bell, which indicates that appellant *may* have been incompetent at the time of his arrest. There can be no argument that appellant was found by Judge Bell to be incompetent as of January 20, 1961. However, defense counsel overlooks the fact that on March 26, 1959, just over a week after the alleged kidnapping, appellant was found to be mentally competent by Dr. E. M. Hammes, Sr. Portions of Dr. Hammes' report have been set out supra. On the basis of Dr. Hammes' report and other evidence, appellant, represented by Attorney Dilworth, was allowed to plead guilty to kidnapping before Judge Donovan on April 1, 1959, at which time he received what turned out to be a void sentence of 25 years' imprisonment. Even though appellant was adjudged incompetent in 1961, it is apparent that his mental incompetency was not a permanent afflic-

---

2. The evidence, both in the written statement signed by appellant, set out at f.n. 1, supra, and in the testimony of Agent Casey, indicates that appellant was told of his constitutional rights. According to Casey's testimony, appellant "did not wish for counsel".

tion. This proposition is borne out by the fact that, after a long and careful hearing before Judge Larson on February 16, 1965, at which time the appellant himself testified at great length, appellant was found mentally capable of standing trial. If appellant was competent in 1965, he may well have been competent in 1959. The report of Dr. Hammes and the conclusion of competency by Judge Donovan are entitled to great weight since they were made very near the time when appellant gave the disputed statement. Certainly the evidence strongly suggests that appellant was competent to waive counsel when he signed the statement. Thus, we feel appellant's contention of a non-effective waiver of counsel, if truly appellant had a right to counsel when he signed the statement, offers no grounds for not admitting the statement into evidence.

We do not need to reach any possible issue concerning the retroactivity of the *Escobedo* decision in light of our holding that the *Escobedo* rationale does not apply to the instant determination.

■ Appellant's second contention concerning the admissibility of the statement, one which we have already touched upon, is that he was not properly advised of his rights, of the nature of the charges, and of the consequences of his waiver of his right to remain silent. Agent Casey testified that he had identified himself and shown his credentials to appellant before interviewing him. Casey then gave the following testimony, which refutes appellant's instant contention:

"Q. Now in addition, Mr. Casey, to showing Mr. Birnbaum your credentials, such as you have just described, did you advise him orally as to his rights?

"A. I told him that he had the right to an attorney, that he did not have to make any statement whatever, and that any statement he made could be used against him as evidence in court.

"Q. And thereafter did he indicate that he desired counsel?

"A. No, he said he did not wish for counsel.

"Q. And did he make a statement to you?

"A. He did.

"Q. Or did you have at least a conversation?

"A. I had a conversation with him and got a written statement from him."

Upon the basis of this testimony and other evidence (e. g., the wording of appellant's statement itself (see f.n. 1, supra)) we find the trial court and the jury could reasonably have concluded that appellant was properly advised of his rights and that with knowledge of such rights he competently stated he did not wish the advice of counsel.

■ Appellant's final contention supporting his claim that the incriminating statement was inadmissible is that the government failed to bring him before a committing magistrate "as quickly as possible" in accordance with Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. As previously noted, appellant was brought before United States Commissioner Eckley at 1:30 p. m. on March 18, 1959, the day of his arrest. At the time Agent Casey interviewed appellant he was properly in the custody of local authorities who were trying to determine whether to lodge charges against appellant. After the facts were determined and it was apparent that there was reason to place appellant in federal custody, Agent Casey acted to obtain a warrant of arrest against appellant and to bring him before the Commissioner "as quickly as possible". There was no abuse of the appellant's rights under the facts herein. See Young v. United States, 8 Cir., 1965, 344 F.2d 1006, certiorari denied, 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105, and cases cited therein.

■ Appellant would further have us note that the admission of the written statement into evidence "effectively precluded defendant from exercising the privilege to remain silent at trial" since

appellant was forced to testify to meet the incriminating allegations of the statement once it was introduced.[3] What appellant claims may be true but in the absence of a showing that the statement was coerced or otherwise improperly obtained and admitted, there can be no error.

■■■ Appellant quotes to us from Payne v. State of Arkansas, 1958, 356 U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975. That was a case of a confession obtained by pure coercion. Therein a mentally dull Negro was charged with first degree murder and sentenced to death. During his trial there was admitted into evidence over his objection a confession shown by undisputed evidence to have been obtained in the following circumstances: He was arrested without a warrant and never taken before a magistrate or advised of his right to remain silent or to have counsel, as required by state law. After being held incommunicado for three days without counsel, advisor or friend and with very little food, he confessed after being told by the Chief of Police that "there would be 30 or 40 people there in a few minutes that wanted to get him" and that if he would tell the truth the Chief of Police would probably keep them from coming in. We find no parallels between Payne and the facts in this case. We have examined the entire transcript in detail. We find no evidence of coercion, promises, threats or other grounds which could aid in determining that the statement of the appellant was inadmissible. The only possible indication of coercion comes from the appellant himself, who testified at great length in his trial. In denying the truth of some portions of his written statement, the appellant said:

"A. Well, sure I told the police something like that. I mean, I could tell the police—if you stood under the lights for about three, four, five, six hours and they try to put you in a sweat box and try to get these false confessions and this brutality out of a guy—I was going to go sleep, I didn't want to hear the stuff, you know. I give them any confessions. It don't mean anything.

"Q. [by Mr. Foley, the Assistant United States Attorney] Then you said, 'I had been planning since 1955 to kill him [Scott].' Is that true?

"A. Well, I didn't say 'planning to kill him'. I didn't say nothing like that. I put it on the statement because they said if I would cooperate with them or something, and make it look good, you see—"

Such testimony was not borne out by other evidence in the case. It stands alone and was obviously not believed by the jury. Taking that view of the evidence which most strongly supports the verdict of the jury,[4] which we must do, it is apparent to us that neither the trial court nor the jury found any coercion exercised on appellant in making the statement.

## II.

### THE CLOSING ARGUMENT BY THE GOVERNMENT

The second claim of error raised by appellant is that the final argument of the Assistant United States Attorney was improper and prejudicial in that it (a) referred to appellant's prior criminal record for purposes other than impeachment, (b) referred to appellant's possible future criminal acts, and (c) referred to the safety of the jurors or others. Portions of the argument objected to by appellant are as follows:

"Now, you have only two choices. You acquit him, he walks out of this court room today with you, and the Judge, and the rest of us, as a free

---

3. It should be noted that the trial transcript indicates appellant's testimony tended to support rather than refute what was contained in the statement taken on March 18, 1959.

4. See, e. g., Smith v. United States, 8 Cir., 1964, 331 F.2d 265, 278, certiorari denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed. 2d 34, rehearing denied, 379 U.S. 940, 85 S.Ct. 321, 13 L.Ed.2d 350, and cases cited therein.

man—for the first time in about twenty years. You give him that badge of good citizenship, say that the Government wrongfully charged him, and he goes out. * * * Now, then, there's no other law, there's no other way, to keep this man in custody. That's not the way criminal law works. The Government doesn't lose the case and then keep a man in custody. * * * And you have to administer justice, and the justice here is to either put him on the streets, or you put him where he belongs.

"* * * But, put him on the streets, and how long will he last? He lasted twelve, thirteen hours, maybe fifteen hours the last time."

▮ As an initial matter, we note that at the time of trial appellant made no objection to the government's closing argument to preserve an appeal thereon in conformity with Rule 51 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. As we stated in Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706, 736, certiorari denied, 371 U.S. 818, 83 S.Ct. 32, 33, 9 L.Ed.2d 58:

"In a situation where, as here, the claim is made that the prosecutor engaged in making repeated prejudicial statements to the jury throughout his argument and from the inception thereof, we believe the better practice is to make objection at the time of the asserted prejudicial utterances. This will afford the court an opportunity to properly warn the prosecutor that improper argument will not be tolerated, and to promptly take action designed to more effectively remove from the minds of the jury the sting or poison of the prejudicial statement. This is the practice that has been adhered to in a number of criminal cases. See and compare Mellor v. United States, 8 Cir., 160 F.2d 757, 765, cert. den. 331 U.S. 848, 67 S.Ct. 1734, 91 L. Ed. 1858; Myres v. United States, 8 Cir., 174 F.2d 329, 338, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Greenberg v. United States, 1 Cir., 280 F.2d 472, 474; United States v. Spangelet, 2 Cir., 258 F.2d 338, 342; Weathers v. United States, 5 Cir., 117 F.2d 585, 586; Henderson v. United States, 6 Cir., 218 F.2d 14, 21, 50 A.L.R.2d 754, cert. den. 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253."

See, also, Feguer v. United States, 8 Cir., 1962, 302 F.2d 214, 253–254, certiorari denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110, and authorities cited therein; Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, 401, reversed on other grounds, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824. We further note that the appellant herein had "no exceptions" to the charge, from which we can infer that the instructions as given cured any error that may have been objectionable in the government's closing argument. It is also doubtful that there was "plain error" here within the meaning of Rule 52 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., so as to justify review of the government's closing argument, in the absence of a timely objection at trial. See Dichner v. United States, 1 Cir., 1965, 348 F.2d 167, 168.

In any event, we feel there is no merit to any of appellant's objections concerning the final argument. Read as a whole, the final argument clearly did not extend over the bounds of propriety. As we stated in Isaacs v. United States, supra, at page 736 of 301 F.2d:

"* * * The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial. It is not amiss for us to again point out that in a criminal case, the United States Attorney has imposed upon him a high and important responsibility. He should present the Government's case with vigor and earnestness, and use all legitimate means to bring about a just conviction, but, likewise, he must refrain from indulging in tactics or methods calculated to produce an unjust conviction."

See, also, Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314.

We find the Assistant United States Attorney's comments were not improper, in view of the substantial testimony voluntarily offered by the appellant while on the stand during direct examination. He volunteered information concerning his criminal record, displaying an almost amazing memory for dates, places, details, room numbers, street addresses, etc. He volunteered information as to his violent nature and his ability to take care of himself in any circumstances. He bragged of his association with professional boxers and stated that " * * * I ran into professional boxers, and I ran into guys rougher than Scott and they didn't stand in my way, so he sure wasn't going to stand in my way". He told of how on one occasion, when he was about to be released from the Wisconsin State Reformatory, he beat up a 250-pound guard with his fists and put the guard in the hospital, saying that he had " * * * beat him pretty bad. I had used my fists on him". For this incident he received three more years in prison. He testified that on another occasion while in a training school two attendants tried to stop him from running away " * * * and I kind of beat them up pretty bad, and they sent me to the Wisconsin State Reformatory." He stated he was in the Winnebago State Hospital, about which he explained:

"Well, it's just a—let's just say a state hospital, just a regular state hospital, and—because I was getting in these fights, and so forth, and they couldn't put up with me in the institution, you know, I was getting to be a—getting in fights five, six, ten times a day.

"Q. You were a problem?

"A. Yah, I was getting in fights."

This testimony, voluntarily offered by the appellant on direct examination, creates a situation vastly different from that in which the prosecuting attorney brings out the criminal record of a defendant in order to attack his credibility. We believe that such voluntary testimony by the appellant, with his almost bragging statements regarding his criminal record, the fights he had been in and the guards he had beaten up, permitted fair comment thereon by the government's attorney in his closing argument to the jury. Certainly the appellant should not be allowed to volunteer and bring before the jury testimony with reference to his past criminal record and escapades and then claim error and ask for a new trial because the prosecuting counsel in argument to the jury has made comment thereon.

As to the references in the closing argument to appellant's possible future criminal acts and of his being dangerous to others, we feel that our opinion by the late Judge John Sanborn in Dusky v. United States, supra, is full answer to appellant's contention. In that case it was said, at page 401 of 271 F.2d:

"Government counsel, during his closing argument to the jury, pointed out that, under Federal law, there could be no verdict of 'not guilty by reason of insanity,' and said of the defendant: 'He is either guilty or not guilty, and if not guilty he walks out that front door. Mr. Scheufler can't stop him, the Judge can't stop him, Dr. Sturgell can't take him back to the Medical Center. That is the end of it so far as the law is concerned. So I want to make it clear that there is only two verdicts.'

"It is contended that that statement and two others—one about the defendant being preoccupied with 'hostility, murder, suicide,' and 'sexual indulgence,' and the other about being 'a man who is pretty dangerous'—constituted such misconduct on the part of the prosecution in final argument as to call for a reversal of the conviction.

"The evidence justified the statement that the defendant was dangerous and preoccupied as counsel for

the Government said he was. Whether the statement that if the defendant were acquitted, any of the persons mentioned by counsel could have prevented his leaving the court room by the front door and that the case would be ended, is perhaps debatable, but to base a reversal on that statement, which was not objected to, would be clearly unwarranted. Moreover, it is vitally important in any case that a statement of counsel, in a closing argument to the jury, deemed to be improper, be called to the attention of the court either at the time it occurs or at the close of the argument."

In light of all the evidence in this case, and upon viewing the closing argument of the Assistant United States Attorney as a whole, it cannot be said that it was so offensive or prejudicial as to prevent the jury from exercising freedom of judgment and thought in its deliberations. Fowler v. United States, 8 Cir., 1965, 352 F.2d 100, 110; Isaacs v. United States, supra, at page 738 of 301 F.2d.

We have carefully considered all of appellant's contentions and find them to be without substantial merit.

This case is affirmed.