**John D. LINCOLN**

v.

**The UNITED STATES.**

No. 233–63.

United States Court of Claims.

Feb. 18, 1966.

Roger K. Powell, Columbus, Ohio, attorney of record, for plaintiff; E. L. Carpenter, Columbus, Ohio, of counsel.

Philip I. Brennan, Washington, D. C., with whom was Acting Asst. Atty. Gen. Richard M. Roberts, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 57(a) to Trial Commissioner Robert K. McConnaughey, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on October 8, 1965. Plaintiff has failed to file exceptions and brief and the time for so doing pursuant to the Rules of the court has expired. On No-

vember 26, 1965, defendant filed a motion pursuant to Rule 63 that the court dismiss plaintiff's petition and adopt the commissioner's report based upon plaintiff's failure to file exceptions and brief or a statement of election authorized by Rule 62. Since the court agrees with the commissioner's findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Defendant's motion to dismiss is granted and plaintiff's petition is dismissed.

This is a suit to recover, with interest, $40,376.38, paid by the plaintiff as income tax with respect to transactions that occurred in 1946, in the course of liquidation of a Virginia corporation, called Virginia-Lincoln Corporation.

The tax the plaintiff seeks to recover was based on an amount equal to a balance which, in 1946, appeared on the books of Virginia-Lincoln as an amount due from the plaintiff to the corporation. The defendant, in assessing the plaintiff's income tax for 1946, treated this amount as the measure of part of a dividend received by the plaintiff upon liquidation of Virginia-Lincoln under a plan of liquidation approved November 29, 1945, and assessed a tax on it at capital gain rates which the plaintiff paid and which he now seeks to recover.

In partial answer to the petition, the defendant has asserted that the plaintiff's recovery is barred by a closing agreement [1] allegedly executed by the plaintiff on or about November 8, 1949, signed by the Commissioner of Internal Revenue on January 3, 1950, and approved by the Acting Secretary of the Treasury on February 6, 1950.[2]

The trial was limited to questions pertaining to the execution of the closing agreement.

The plaintiff admits that a form of closing agreement, probably signed with his name, was submitted by Mr. Allen H. Gardner, an attorney authorized to represent the plaintiff generally in the controversy concerning taxes arising out of the plan for reorganization of Virginia-Lincoln, and that such a document was signed by the Commissioner, and approved by the Acting Secretary of the Treasury. He claims, however, that he never signed the closing agreement personally, and that, as a consequence, it is not binding upon him and does not preclude him from maintaining the claim asserted in this case for recovery of the

---

1. The text of the alleged closing agreement provides, in part:

    The amounts received by said taxpayer from Virginia-Lincoln Corporation subsequent to November 29, 1945, the date of the adoption of the plan of liquidation, constitute amounts received in the complete cancellation and redemption of shares of stock of said Virginia-Lincoln Corporation within the meaning of Section 115 (c) of the Internal Revenue Code; and the gain or loss to said taxpayer, represented by the difference between the adjusted basis of the shares of stock surrendered and the cash plus the fair market value of the other properties received therefor, constituted, or will constitute, capital gain or loss within the meaning of Section 117(a) of the Internal Revenue Code.

2. 26 U.S.C. (I.R.C.1939) § 3760 (1952 ed.) provides:

§ 3760. Closing Agreements—

    (a) *Authorization.*—The Commissioner * * * is authorized to enter into an agreement in writing with any person relating to the liability of such person (*or of the person* or estate *for whom he acts*) in respect of any internal revenue tax for any taxable period.

    (b) *Finality.*—If such agreement is approved by the Secretary, the Under Secretary, or an Assistant Secretary, within such time as may be stated in such agreement, or later agreed to, such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

    (1) The case shall not be reopened as to the matters agreed upon or the agreement modified, by any officer, employee, or agent of the United States, and

    (2) In any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded. [*Emphasis supplied.*]

amount paid in satisfaction of the tax thereafter determined.

No signed copy of the closing agreement bearing a handwritten signature of the plaintiff's name is in evidence. One of the witnesses, a retired Internal Revenue agent, who, during the period 1947–50 had examined the income tax returns and other evidence relating to the taxability of the plaintiff, his brother, and the two corporations, testified that, in the past, in the course of his work, he had seen, among the defendant's records, a copy of the closing agreement bearing a handwritten signature of the plaintiff's name. Despite a thorough search of the defendant's records in preparation for the trial, no copy of the signed agreement has been found.

The plaintiff denies ever having, or ever seeing, a copy of the agreement signed with his name, and says that, until recently, he had never been informed that any such document ever existed.

The evidence as a whole leaves no room for doubt, however, that, in the fall of 1949, the plaintiff's name was signed to duplicate copies of a form of closing agreement by someone, that the signed, duplicate copies were sent to the Commissioner of Internal Revenue, in November of that year, by an attorney authorized to represent the plaintiff generally with respect to his 1946 tax liability, and that, after official approval of the agreement, in February 1950, one of such copies was sent to Mr. Leon D. BeVille, treasurer of Virginia-Lincoln, and the other was retained among the Internal Revenue records, subject to a direction that it be attached to the original of the plaintiff's income tax return for 1949. That return was destroyed in February 1964, in accordance with a policy of the Internal Revenue Service for destruction of aging documents. The evidence affords a basis for a reasonable inference that the signed copy of the closing agreement was destroyed at the same time, although the record contains no positive proof of this.

The unavailability of a signed copy of the agreement precludes comparison of the signature on the document with known examples of the plaintiff's handwriting or of the handwriting of other persons who might have signed his name to it.

The evidence does, however, show that a closing agreement, signed with the plaintiff's name, was duly approved in February 1950, and does not wholly dispel the possibility that the plaintiff may have signed the closing agreement that was approved.

The plaintiff's recollection of details concerning arrangements carried out in 1949 and 1950 with respect to the liquidation of Virginia-Lincoln was understandably imprecise, and his mere failure to recollect signing the closing agreement is less than positive proof that he did not.

The plaintiff's specific denial that he signed the agreement was not based on a definite recollection of a specific, deliberate refusal of any identified opportunity to do so, but upon a reasoned conclusion that he would not have signed any such agreement because of a belief that, if he had, he would have been precluded, contrary to his wishes at the time, from continuing the manufacturing business he was then carrying on at the Lincoln Industries plant. For reasons elaborated hereafter, it is clear that, at the time the plaintiff's name was signed to the closing agreement, discontinuance of the manufacturing operation was neither an apparently certain, nor an apparently probable consequence of his signing the agreement. On the contrary, it had been quite clear, since months before the time the agreement was signed, that continuance of the manufacturing operation was an integral part of the plan of which the closing agreement was also a part.

As events transpired, the agreement was signed with the plaintiff's name, by someone, and was approved, and taxes were assessed and paid in accordance with its provisions just as if he had signed, and yet, the manufacturing operation continued without any consequent impediment until it was terminated, for quite different reasons, in 1954, 5 years later, and, according to the plaintiff, he never knew there was such an agreement.

In these circumstances, on the evidence in this record, the plaintiff's denial that he signed the agreement may not properly be regarded as overcoming the presumption, established by section 3809 (b) of the Internal Revenue Code of 1939, as amended,[3] that his signature was genuine.

Moreover, the agreement must be regarded as binding on the plaintiff, even if he did not personally sign it, as an agreement made pursuant to authority from the plaintiff, established, maintained, and confirmed by his consistent, previous practice, over a period of years, of having others sign, for him, his income tax returns, and any other papers that were necessary in connection with his personal income taxes.

The reasons for these conclusions derive from circumstances attending the negotiation of the closing agreement, the nature and extent of the plaintiff's participation in the activities of Virginia-Lincoln and Lincoln Industries, and his professed, continuous disregard, between 1943 and 1954, of all matters concerned with the determination of his personal income tax liabilities.

During a period beginning in 1943 and extending at least until March 1, 1950, the plaintiff was vice president and a director of Virginia-Lincoln, and of Lincoln Industries, Inc., which originally was a wholly owned subsidiary of Virginia-Lincoln. Personally, and as a trustee for his two daughters, he owned half the stock of Virginia-Lincoln. His brother, C. C. Lincoln, Jr., was president and a director of the two corporations and owned the other half of the Virginia-Lincoln stock. The plaintiff testified that he bought out his brother's interest in March of 1950, after the events with which this case is primarily concerned.

The plaintiff devoted himself mainly to production aspects of the manufacturing business carried on through the two corporations. He says he paid relatively little personal attention, if any, to adjustments that may have been proposed, or made, in the corporate structure of the enterprise, to its relations, or those of its stockholders, with the Bureau of Internal Revenue, or to any other phases of the business not directly concerned with the manufacture of its products.

His testimony indicates, however, that he had definite opinions in opposition to any rearrangement of the corporate relationships that would have terminated the manufacturing operation, and that he had considerable knowledge of arrangements made for financing the continuance of manufacturing after the spring of 1946, when one of the plants was sold—including a plan for utilization of funds which he and his brother had invested in marketable securities, and had agreed to use, as needed, as a capital pool for financing manufacturing, through Lincoln Industries.

According to the plaintiff, during the whole period of his participation in the Virginia-Lincoln enterprise, until 1954, he followed a policy of total inadvertence to all matters concerned with his personal tax liabilities. He testified that he did not believe he ever signed a tax return himself before 1954. Instead, all his personal tax returns were prepared, and signed for him, either by BeVille, the treasurer of Virginia-Lincoln, or by a Mr. Kimble, an accountant in Roanoke, Virginia, who also did work for the Lincoln enterprises.

According to the plaintiff, although he never specifically authorized anyone to execute a closing agreement for him, these gentlemen had authority to act for him with respect to his personal income taxes and to execute such documents concerning them as were necessary.

---

3. U.S.C. § 3809 (1952 ed.) provides:
§ 3809. Verification of returns; penalties of perjury—
  *     *     *     *     *
  (b) *Signature Presumed Correct.*—The fact that an individual's name is signed to a return, statement, or other document filed shall be prima facie evidence for all purposes that the return, statement, or other document was actually signed by him.
  *     *     *     *     *

Moreover, it is clear from the record that Mr. Gardner had general authority to represent the plaintiff with respect to the tax liabilities asserted against him as a result of the proposed liquidation of Virginia-Lincoln, and was specifically employed by either BeVille or Kimble to conduct negotiations on behalf of the plaintiff with respect to the basis on which such liabilities should be determined.

Beginning in 1947, Mr. Gardner, acting pursuant to that authority, conducted such negotiations to an ostensibly successful conclusion, in February 1950, when the Acting Secretary of the Treasury approved a closing agreement that Mr. Gardner had submitted in the plaintiff's name, along with three other similar agreements he had submitted at the same time—one on behalf of the plaintiff's brother, and two on behalf of the plaintiff as trustee for his children.[4]

A number of events, leading eventually to the approval of the closing agreement, are significant to a determination of its validity.

Before the Second World War, the Lincoln enterprise manufactured furniture. It had two plants—one at Marion, Virginia (directly owned by Virginia-Lincoln), and one at Damascus, Virginia (owned by Virginia-Lincoln's wholly owned subsidiary, Lincoln Industries, Inc.).

In 1942 or 1943, Virginia-Lincoln's plant at Marion burned. Liquidation of the enterprise was considered at that time, but, instead, partly as a result of urging by officials of the Army and Navy, a new plant was built at Marion, and articles needed for the war were produced there by Virginia-Lincoln until the end of hostilities in 1945.

The plaintiff's recollection of what happened thereafter, as expressed in his testimony, is not precisely revealing concerning specific steps taken between November 1945 and 1954 with respect to the liquidation of Virginia-Lincoln.

However, a request for a ruling, dated June 20, 1947, and a brief, dated December 20, 1949, submitted to the Commissioner of Internal Revenue by Mr. Gardner, on behalf of the plaintiff, among others, describe the ensuing events. The record affords no reason for doubting the truth of the representations made in those documents. The facts represented are summarized immediately hereafter.

A plan for liquidation of Virginia-Lincoln, whereby it would distribute its assets in kind to its stockholders, was approved in November 1945. Pursuant to that plan, Virginia-Lincoln purchased its preferred stock, and the certificates for its common stock were delivered to an escrow agent for cancellation upon completion of the liquidation.

In March 1946, the Virginia Corporation Commission issued a certificate of dissolution of Virginia-Lincoln.

Immediately thereafter, proportionate, undivided interests in the dissolved corporation's real estate, machinery, and equipment were conveyed to its stockholders and, in May of that year, some of these physical assets, including the Marion plant, were sold to the Brunswick-Balke-Collender Corporation.

It is the tax on an amount which then appeared on Virginia-Lincoln's books as due the corporation from the plaintiff, and which the defendant treated as part of the plaintiff's share of the proceeds of this partial liquidation of Virginia-Lincoln, that is in controversy in this suit.

While the events, just described, affecting Virginia-Lincoln, were occurring, manufacturing operations continued, under the plaintiff's direction, in the Damascus plant owned by Lincoln Industries.

At about the time the certificate of dissolution of Virginia-Lincoln was issued, and some of its assets were sold, a decision was reached to improve and expand Lincoln Industries' Damascus plant. The development of this program appar-

---

4. Only the closing agreement submitted in the name of the plaintiff personally is in issue in this case.

ently gave rise to a previously unanticipated need for capital, and to second thoughts about prompt completion of the liquidation of Virginia-Lincoln by distributing its remaining assets in kind to its stockholders. Consideration was given to modification of the plan to provide for a reorganization, whereby Virginia-Lincoln's remaining assets would be transferred to Lincoln Industries, and Lincoln Industries would issue capital stock to Virginia-Lincoln and assume the liabilities of Virginia-Lincoln, which would then distribute the Virginia-Lincoln stock to its stockholders.

There had been a difference of opinion between the plaintiff, who testified that he opposed "liquidation" because he wanted to continue active manufacturing operations, and his brother, who apparently wanted to liquidate the enterprise entirely and cease manufacturing. The upshot of this controversy was that manufacturing operations continued under the plaintiff's direction at the Damascus plant, through Lincoln Industries, until sometime in 1954, when other difficulties, not related to the issues here, led to a sale of the Damascus plant. Before that occurred, the plaintiff had acquired his brother's interest.

The plaintiff says that, throughout the time when the plans for the liquidation of Virginia-Lincoln were being made and partially carried out, and steps were being taken to establish the basis for taxation of the resulting distributions, he was devoting most of his time and attention to production at the Damascus plant. Although he was a director of both corporations and professed to be opposed to liquidation of Virginia-Lincoln primarily because he had sons coming on at that time and wanted to run a business for them, he says he paid little, if any, attention to what was being done about the liquidation.

It is apparent from this record, however, that, whether he paid attention or not, the partial liquidation of Virginia-Lincoln that had occurred in 1946 did not substantially impede attainment of his objective of continuing with the manufacturing business. Production continued at the Damascus plant of Lincoln Industries, without interruption, until that operation ran into other difficulties in 1954.

It is also apparent from this record that the prospect, explicit in the closing agreement, that proceeds of the liquidation of Virginia-Lincoln would be treated as amounts received in the complete cancellation and liquidation of Virginia-Lincoln's stock, and that such proceeds would be taxed as capital gains or losses, could not reasonably have been regarded by the plaintiff, in the fall of 1949, as a substantial threat to the continuance of Virginia-Lincoln's manufacturing operations.

In a letter, dated March 14, 1949, to the Commissioner of Internal Revenue, amending a previous request for a ruling, Gardner stated that it was then proposed to complete the liquidation of Virginia-Lincoln in accordance with the original plan, by distributing its assets in kind to its stockholders and canceling its stock, and that included among the assets to be distributed would be Virginia-Lincoln's stock in its subsidiary, Lincoln Industries, *"which latter corporation will continue its present business."* [Emphasis supplied.]

It is obvious from this representation that the proposal that Lincoln Industries would continue its manufacturing business after liquidation of Virginia-Lincoln was a settled part of the plan as early as March 14, 1949. If the plaintiff paid any attention whatever to the one aspect of the program which, according to his testimony, was his primary, if not his only, concern with the liquidation plans, he must have known this at the time when the closing agreement forms were signed, in the fall of 1949.

In the light of these facts, the record affords no substantial support for the plaintiff's professed recollection that, in the fall of 1949, a threat of termination of the manufacturing operations existed as a real or apparent reason for his refraining from execution of the proposed closing agreement.

The evidence similarly affords no basis for concluding that any apparent threat to continuance of the manufacturing business existed in the fall of 1949 as a reason for the plaintiff to object to execution of the closing agreement on his behalf by others, or to restrict BeVille's or Kimble's previously unlimited authority to do whatever was necessary concerning his personal taxes by denying them authority to execute the proposed closing agreement. Moreover, there is no evidence that he took any action in 1949 that could conceivably be construed as limiting their authority, either expressly or by implication, in this or any other way.

Nor does the evidence establish that BeVille or Kimble had any reason spontaneously to regard the plaintiff's desire to continue manufacturing operations as imposing, by implication, any limitation on their previous general authority to handle all of his tax matters without requiring his personal signature on any necessary papers. By the time the closing agreements were signed, the program for liquidation of Virginia-Lincoln notoriously contemplated continuance of manufacturing by Lincoln Industries, and execution of the closing agreement was wholly consistent with the plaintiff's desire that the manufacturing enterprise should continue.

In summary, there is no evidence that the plaintiff ever took any action of any kind, before the signing and approval of the closing agreement, that would have given BeVille or Kimble, or anyone with whom they might have dealt previously with respect to the plaintiff's taxes, any reason to believe that they no longer had the comprehensive authority to act for him in matters affecting his personal taxes (including authority to sign any necessary papers) that one or the other of them had been exercising for a number of years.

The plaintiff says that, throughout the period when alternative methods of disposing of Virginia-Lincoln were under consideration, he continued, as he had previously, to remain altogether aloof from personal participation in any actions concerning his personal taxes. He says that, throughout that period, he neither signed his own tax returns, nor signed any other papers concerning his personal taxes, but that such matters were all handled for him by BeVille or Kimble, as they had been previously. From this it is apparent that whatever authority Be Ville or Kimble, or both of them, had to handle the plaintiff's personal tax affairs—and their authority appears to have been complete, though informal—that authority continued, unchanged, throughout the period when Gardner was negotiating the closing agreements.

In his testimony the plaintiff said he had no recollection of signing the closing agreement and specifically denied that he did so. There is no affirmative proof that he did. Yet the record plainly shows that a form of the agreement, signed with his name, was submitted to the Commissioner of Internal Revenue in November 1949, and was approved by the Acting Secretary of the Treasury on February 6, 1950.

The record also plainly shows that, on September 27, 1949, Gardner sent the forms of the agreements to BeVille, with his recommendation that they be executed, that on November 23, 1949, BeVille sent them back, purportedly executed in duplicate, and that by November 29, 1949, Gardner sent them to the Commissioner of Internal Revenue for his signature and for ultimate approval by the Acting Secretary of the Treasury.

The procedure followed at Internal Revenue, in processing requests for approval of closing agreements, required that two copies of the agreement bear the signature of the person proposing to enter such an agreement. The fact that the agreement submitted on behalf of the plaintiff survived this processing, and was approved, affords an ample basis for concluding that two of the copies submitted were signed with the plaintiff's name.

Even if the plaintiff's denial that he signed the agreements be accepted as more than a mere failure to recollect

whether he did or not, the sequence of events that led to the submission and approval of the agreements substantially precludes any reasonable inference that the signature of his name on the forms of agreement was unauthorized.

BeVille, and Kimble, had full authority to sign papers necessary for determination of the plaintiff's income tax liabilities. The record affords no basis for suspicion that the forms of agreement which BeVille returned to Gardner in the fall of 1949, for submission to the Commissioner, were not signed, either by the plaintiff himself, or by BeVille or Kimble, under their general authority to sign papers relating to the plaintiff's taxes, or by someone manually executing their authority pursuant to their direction. The procedure followed precludes any reasonable possibility that the forms BeVille sent to Gardner had been signed by some irresponsible person who lacked actual authority to affix the signature of the plaintiff's name.

It is an almost unavoidable inference from this record that, if the plaintiff did not sign the closing agreement himself, it was signed pursuant to the authority which admittedly he had accorded to BeVille or Kimble, or both of them, for years, to sign his name to any necessary papers concerned with his personal taxes.

[3] Moreover, if there should be any doubt of their authority, the plaintiff, having acquiesced for years in their handling of all matters concerning his personal taxes, may not now assert that, in signing the plaintiff's name to the closing agreement, or having the plaintiff's name signed to it, BeVille exceeded the authority, apparent to him, by reasonable implication from the plaintiff's extended acquiescence in his previous performance of comparable functions on the plaintiff's behalf.

This was actual authority which, even if it was never expressly given, had derived by implication from a continuous course of conduct calculated to establish and verify, to anyone concerned, that there was an understanding between BeVille and the plaintiff that documents relating to the plaintiff's taxes, signed in the plaintiff's name by BeVille or Kimble, or at their direction, would be binding on the plaintiff.[5]

If, as the plaintiff testified, he never personally signed a tax return before 1954, nor personally executed any other papers concerned with his taxes, the defendant's representatives had neither any reason for questioning, nor any means for verifying, whether the signature on the closing agreement forms was in the plaintiff's hand. In those circumstances, they were entitled to rely on the statutory presumption that the signature was his.

The evidence does not establish, convincingly, that the signature on the closing agreements was not either the plaintiff's own, or a signature affixed pursuant to authority established by his longstanding delegation to BeVille and Kimble of responsibility for handling all matters affecting his personal taxes.

5. The actual authority present here is to be distinguished from apparent authority which depends upon the reasonable implications of a course of conduct that creates an appearance of authority to persons dealing with an ostensible agent, even though no actual authority exists. See, e. g., Masuda v. Kawasaki Dockyard Co., 328 F.2d 662 (2d Cir. 1964); Gilmore v. Royal Indemnity Co., 240 F.2d 101 (5th Cir. 1956). Cf. Robinson v. Comm'r of Internal Revenue, 100 F.2d 847 (6th Cir. 1939), which deals with equitable estoppel based on a course of dealing with the Bureau of Internal Revenue.

There is no evidence here that any of the individual representatives of the defendant who processed his tax documents had ever been informed that the signature of his name on any of such documents was not in his own handwriting. Accordingly, they do not appear to have had any occasion, or opportunity, to rely upon the apparent authority of BeVille or Kimble to sign the plaintiff's name. Whatever reliance they may have had occasion to place on appearances rests on the statutory presumption that the plaintiff's name, signed to tax documents, was actually signed by him. 26 U.S.C. § 3809 (b) (1952 ed.) supra.

**154**

The evidence as a whole requires the conclusion that the closing agreement is binding on the plaintiff. As a consequence, determinations made in accordance with it may not be modified in this proceeding.[6]