**UNITED STATES of America, Plaintiff,**

v.

**Mary MENSIK et al., Defendants.**

**No. 69 C 2689.**

United States District Court, N. D. Illinois, E. D.

Sept. 24, 1974.

S. Martin Teel, Jr., Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Mayer, Brown & Platt, Sherwood K. Platt, George V. Bobrinskoy, Jr., Brian R. McKillip, Chicago, Ill., for defendant.

## DECISION ON THE MERITS

ROBSON, Chief Judge.

This action was brought by the United States to foreclose a federal tax lien filed against residential property located in Oak Park, Illinois. Pursuant to a Pretrial Order entered on March 14, 1974, this matter was submitted to the court for decision on the merits based

on the briefs of the parties. For the reasons stated below, this court is of the opinion that judgment should be entered for the defendants: Gordon C. Borchardt; Mary A. Borchardt and Mid-America Bank of Chicago.

The trial record consists of: a) a stipulation of undisputed facts; b) numerous exhibits consisting mainly of Internal Revenue Service forms; and c) the depositions of Mary Mensik, Robert Lacey and George Suzuki. There was no evidentiary hearing held in this cause.

The court, having considered the testimony and exhibits submitted in this cause and having examined the written trial briefs of counsel, finds:

1) the jurisdiction of this court was properly invoked under 26 U.S.C. §§ 7402–7403 and 28 U.S.C. §§ 1340 and 1345; and

2) the government has failed to meet its burden of proving all the elements necessary to establish a valid and subsisting lien on the property in question.

Defendants Gordon and Mary Borchardt are the present fee owners of the Oak Park property. Defendant Mid-America National Bank of Chicago is their mortgagee. Defendant Mary Mensik is the taxpayer upon whom the tax assessment was made and was the sole owner of the property when the lien attached. Charles Oran Mensik, the husband of Mary Mensik, has never had an interest in the property. The Mensiks have not taken an active role in this litigation and references to "defendants" in this memorandum shall mean the Borchardts and the Mid-America National Bank of Chicago.

On June 17, 1958, a federal tax assessment was made against the Mensiks for 1956 income taxes and a notice of federal tax lien was filed against Mary Mensik's Oak Park property. Subsequently, in February, 1967, the property was conveyed to the Wright Mortgage Company which, in turn, conveyed it to the Borchardts. The pending foreclosure action was commenced on December 29, 1969. Default judgment was entered against Mary Mensik on April 2, 1971.

Upon the assessment of a tax by the IRS, the amount of the tax becomes a lien in favor of the United States on all personal and real property of the taxpayer. 26 U.S.C. § 6321. Generally, a recorded federal tax lien takes priority over the interests of subsequent purchasers. 26 U.S.C. § 6323. The lien continues until the underlying tax liability has been satisfied or the six-year collection period expires. 26 U.S.C. § 6322. This period may be extended by the execution of tax collection waivers by the taxpayer and the Treasury Secretary or his delegate. 26 U.S.C. § 6502. The sole issue to be determined in this proceeding is the Borchardts' statute of limitations defense, which, in turn, depends upon the validity of each of three tax collection waivers.[1] The government contends that these waivers extended the statute of limitations to the last days of the years of 1965, 1967 and 1969. If the waivers are invalid, the government's lien has been extinguished, and this foreclosure suit must fail.[2]

The parties stipulated to the following facts, *inter alia*:

1. Shortly prior to May 29, 1964, Robert C. Lacey, a revenue officer, met with Charles Mensik at Mensik's office

1. There is no contention that the Mensiks' tax liability has been satisfied or that the notice of tax lien was improperly filed.

2. In an earlier phase of this litigation, the Court of Appeals reversed this court's order of summary judgment in favor of the government, holding that material issues of fact existed as to whether or not Mary Mensik signed each of the waivers. 470 F.2d 257. This formulation of the issues by the Court of Appeals results from the fact that at all times from the filing of the Complaint in December, 1969, until the Court of Appeals' opinion in November, 1972, the government contended that it was Mary Mensik herself who signed the waivers. However, subsequent to the November, 1972 decision, Mary Mensik became available for deposition. In her deposition, Mrs. Mensik denied signing any of the waivers. Consequently, the government has altered its theory to reflect this new evidence.

at City Savings and Loan Association in order to obtain from Mensik and his wife, Mary, an executed tax collection waiver extending the period of collection to December 31, 1965. Lacey told Mensik that it was necessary that Mary Mensik sign the waiver in Lacey's presence. Mensik told Lacey that because Mary Mensik was highly nervous and upset, she could not execute the waiver in Lacey's presence. Lacey left the unexecuted waiver with Mensik and told Mensik that as long as he executed the waiver in Lacey's presence, Lacey would rely on his credibility to get his wife's signature.

On May 29, 1964, Lacey met with Charles Mensik at Mensik's office; when Lacey arrived, the signature "Mary Mensik" already had been placed on the waiver. Lacey observed Mensik sign his name to the waiver. Mensik advised Lacey that Mary Mensik had signed the waiver. Statement of Stipulated Facts, No. 3.

2. Shortly prior to July 30, 1965, Robert Lacey again met with Charles Mensik at City Savings and Loan to obtain from Mensik and his wife an executed tax collection waiver extending the period of collection to December 31, 1967. At this meeting, Lacey again advised Mensik that it was necessary that Mary Mensik sign the waiver. Mensik again stated that because of his wife's health, he would get her signature. Lacey left the waiver with Mr. Mensik.

On July 30, 1965, Lacey met with Charles Mensik at Mensik's office; when Lacey arrived, the signature "Mary Mensik" had already been placed on the waiver. Lacey observed Mensik sign his name to the waiver. Statement of Stipulated Facts, No. 5.

3. On or about February 5, 1967, George Suzuki, a revenue officer, met with Charles Mensik at Suzuki's office in order to obtain from Mensik and his wife another executed tax collection waiver which would extend the period of collection to December 31, 1969. Suzuki advised Mensik that Mrs. Mensik would have to sign in Suzuki's presence. Mensik asked Suzuki not to contact Mrs. Mensik because of her poor physical and mental condition and assured him that he would obtain his wife's signature. Suzuki gave the waiver to Mensik.

On February 15, 1967, Mensik came to Suzuki's office with the waiver. At that time, the signature "Mary Mensik" had already been placed on the waiver. The signature "Charles Oran Mensik" on the "By" line had also been placed on the document. Mensik signed his name on the taxpayer line in the presence of Suzuki. Mensik told Suzuki that he signed his name following his wife's to indicate that he witnessed her signature. Statement of Stipulated Facts, No. 6.

4. Charles Mensik asked both revenue officers not to contact Mary Mensik concerning the waivers. Statement of Stipulated Facts, No. 7.

5. Mary Mensik did not sign any of the three waivers. Statement of Stipulated Facts, No. 8.

6. Charles Mensik did not sign Mary Mensik's name to any of the three waivers. Statement of Stipulated Facts, No. 9.

7. The government has been unable to ascertain who signed Mary Mensik's name to the waivers. Statement of Stipulated Facts, No. 10.

8. Out of a total of 21 documents extending the period of assessment of taxes or extending the period of collection of taxes which were produced by the government and which purportedly bear Mary Mensik's signature 19 were not signed by Mary Mensik. Mary Mensik is uncertain as to whether she signed the remaining two documents. Statement of Stipulated Facts, No. 11.

The only evidence over which there is serious dispute is the testimony of Mary Mensik. Relying solely upon her deposition, the government has theorized that Mrs. Mensik verbally authorized her husband, Charles Mensik, to sign the tax collection waivers on her behalf; that Charles Mensik delegated the mechanical task of signing Mary Mensik's name to

an unknown third person; and that even if she did not give her husband authority to sign the waivers, Mrs. Mensik ratified the acts of her husband during the course of the deposition. Defendants have raised the following objections: 1) the proffered waivers are invalid because the government failed to adhere strictly to the provisions of 26 U.S.C. § 6502; 2) Mary Mensik's testimony is palpably untrue; 3) the factual premise for the government's delegation theory does not exist; 4) the purported ratification by Mary Mensik was ineffective because of the intervening rights of third parties; and 5) the government's failure to produce certain documents warrants dismissal.

Section 6502(a) of the Internal Revenue Code (26 U.S.C. § 6502(a)) provides for extension of the six-year period of limitation on the collection of taxes if there is a waiver "agreed upon in writing by the Secretary or his delegate and the taxpayer. . . ." Similarly, the implementing regulations require that the period may be extended only by a written agreement executed by the district director and the taxpayer. Treasury Regulation § 301.6502–1(a)(2)(i).

■ Strictly construing the statute and the regulations, defendants contend that to be effective a tax collection waiver must be signed personally by the taxpayer. Since the government admits that Mary Mensik did not sign the waivers, defendants conclude that dismissal should be granted.

However, a review of the relevant case law demonstrates that courts have liberally applied principles of agency to bind taxpayers to collection waivers signed by their agents under a general power of attorney. Vanderlip v. United States, 6 F.Supp. 965 (Ct.Cl.), cert. denied, 293 U.S. 588, 55 S.Ct. 102, 79 L.Ed. 683 (1934); Wood v. United States, 17 F. Supp. 521 (Ct.Cl.), cert. denied, 302 U.S. 719, 58 S.Ct. 40, 82 L.Ed. 556 (1937); 10 Mertens, Law of Federal Income Taxation, §§ 57.58, 57.60, 57.61 and cases cited therein.

Moreover, this approach has been consistently adopted in analogous areas of tax litigation. In Lincoln v. United States, 174 Ct.Cl. 726, 356 F.2d 145, 149 (1966), the court, in upholding a voluntary closing agreement, stated:

"Moreover, the agreement must be regarded as binding on the plaintiff, even if he did not personally sign it, as an agreement made pursuant to authority from the plaintiff, established, maintained, and confirmed by his consistent, previous practice, over a period of years, of having others sign, for him, his income tax returns, and any other papers that were necessary in connection with his personal income taxes."

Similarly, in Estate of Upshaw v. Commissioner, 416 F.2d 737 (7th Cir.), cert. denied, 397 U.S. 962, 90 S.Ct. 993, 25 L. Ed.2d 254 (1969), the court found an income tax return to be a joint return despite the absence of the wife's signature. The court stated at 742–743:

"[I]f she intended to file a joint return, it may be found to be such even though she did not sign it or expressly authorize it to be signed for her. Heim v. Commissioner of Internal Revenue, 251 F.2d 44 (C.A. 8, 1958); Kann v. Commissioner of Internal Revenue, 210 F.2d 247 (C.A. 3, 1953) cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109 (1954)."

See also United States v. Ponder, 444 F. 2d 816 (5th Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 944, 30 L.Ed.2d 788 (1972); O'Connor v. Commissioner, 412 F.2d 304 (2d Cir. 1969), cert. denied, 397 U.S. 921, 90 S.Ct. 908, 25 L.Ed.2d 102 (1972); Furnish v. Commissioner, 262 F.2d 727 (9th Cir. 1958).

Defendants' reliance on Rohde v. United States, 415 F.2d 695 (9th Cir. 1969), and Brafman v. United States, 384 F.2d 862 (5th Cir. 1967), is misplaced. Rohde involved the failure of the district director or any other IRS official to sign a tendered tax collection waiver on behalf of the government. In holding that the applicable regulations required the sig-

natures of both the taxpayer and the district director, the court expressed the fear that in the absence of *any* signature binding the government, the district director could avoid the appearance of consent to the terms of the waiver. Similarly, in *Brafman*, a tax assessment levied against a taxpayer's estate was held to be invalid because of the failure of any IRS official to sign the certificate on behalf of the government. By contrast, the waivers challenged in the pending litigation were purportedly signed on behalf of Mary Mensik.[3]

Defendants also contend that Section 601.502(c)(1) of the procedural rules of the Internal Revenue Service authorizes the execution of tax collection waivers by an agent only when the taxpayer has executed and filed a written power of attorney in proper form with the IRS. Since no written power of attorney was executed by Mary Mensik, defendants submit that Charles Mensik was without authority to sign the waiver for her.

■ However, subparagraph (4) of § 601.502(c) clearly provides that the Commissioner may, at his discretion, waive any of the requirements set out in the preceding paragraphs. Thus, the acceptance of the challenged extensions, without the filing of a written power of attorney, constituted a waiver by the Commissioner of his own "housekeeping" provisions. 10 Mertens, Law of Federal Income Taxation, § 57.60; Kann v. Commissioner, 210 F.2d 247 (3d Cir. 1953), cert. denied, 347 U.S. 967, 74 S. Ct. 778, 98 L.Ed. 1109 (1954). Moreover, the procedural rules are not promulgated by the Secretary of the Treasury and have therefore been deemed to be directory and not mandatory. Geurkink v. United States, 354 F.2d 629 (7th Cir. 1965).

■■ These decisions establish that a tax collection waiver executed by an agent acting under a power of attorney is binding on the taxpayer where the government can establish that the agent, in fact, had authority to act in tax matters. Thus, the critical question before this court is whether Charles Mensik had the requisite authority to act on behalf of his wife, Mary. The court is of the opinion that he did not.

The government's "verbal power of attorney" theory is based solely on the deposition testimony of Mary Mensik. However, a careful examination of that testimony reveals it to be evasive, inconsistent and implausible.

Under direct examination by Mr. Teel, the government's attorney, Mrs. Mensik denied, *without qualification,* ever giving her husband authority to sign her name to any document.

"Q. BY MR. TEEL: Were there any times that your husband signed any documents in your name? *Specifically, did he take a pen and write your name on any documents, that you would know of?*

"A. *Not that I know of.* I never know of him—you know, like tax returns, he explained to me, you know, and then he would say, 'Sign it. I made so much and so much a year.'

"*But, you know, he never signed anything without my knowledge.* There is more than one Martha Mitchell in this world and most of us are Martha Mitchells.

"Q. *Did you ever tell your husband that he could or that he could not sign documents on your behalf?*

"A. *No.* I never had any problem there because he was—I mean, as far as documents were concerned, he would bring that—you know, he would

3. Moreover, *Rohde* was recently distinguished in United States v. Lee, 333 F.Supp. 398 (E.D.Pa.1971), in which a taxpayer challenged the validity of a tax collection waiver because it was signed by a delegate of the district director. Although the applicable regulation, Treasury Regulation § 301.6502–1(a)(2)(i), required signing "by the taxpayer and the district director," the court held that the district director's delegate could sign on his behalf.

bring them to me, and explain them to me and I would sign them, but otherwise *I have never known of any case where he signed anything.*

"Q. Did your husband handle the family business transactions?

\* \* \* \* \* \*

"A. Well, he took care of the business, but, I mean, when it came to something where I had to—of course, naturally, *if he wanted me to sign he would bring it home and I would sign it.* . . ." (Emphasis added.) Mensik Dep. pp. 13–15.

In later direct testimony, Mrs. Mensik reversed her position and discussed at length the purported authority which she gave to her husband. But that testimony, upon analysis, is internally inconsistent and beyond credibility.[4]

Mrs. Mensik testified that her husband handled the family's business affairs and was responsible for the preparation of tax-related documents. Mensik Dep. pp. 10–11. She further testified that, as a general rule, she would personally sign any documents but that by "agreement" her husband was authorized to sign on her behalf when she was away from Chicago. Mensik Dep. pp. 21–24. It is this phantom "agreement" on which the government relies to support its verbal power of attorney theory. However, if any such "agreement" existed, Mrs. Mensik's recollection of it was extremely vague and uncertain. When pressed by Mr. Teel for the specifics of the "agreement" Mrs. Mensik's elusive response was as follows:

"Q. How did the agreement come about?

"A. Well, he would say, as I said, he says, 'I have some papers that are —something is coming up and I would like to have you sign. When are you leaving?'

"I would say, 'Well, I'm leaving next week.'

"He would say, 'I might need it, you know, before then.'

"In most cases he would bring them home as soon as he could, possibly could, and have them signed. Of course, if he didn't he would say, 'I will have you sign it.' But he would say, 'I want you to know what it's all about, you know.'"

Obviously not satisfied with this answer, Mr. Teel repeatedly attempted to draw from Mrs. Mensik the exact terms of the "agreement." But not once did Mrs. Mensik describe either the origin or the specifics of the "agreement" in an intelligible manner.

Focusing on the challenged waivers, Mrs. Mensik's story becomes even more implausible. Mrs. Mensik stated that Charles Mensik read and explained each of the waivers to her, at which time she agreed to sign them. Mensik Dep. pp. 79–80, 87. But this raises the question: Why did Mrs. Mensik not immediately sign any of the disputed waivers? When pressed on this point, Mrs. Mensik stated that the waivers would lie around the house and that she would simply not get around to signing. Mensik Dep. p. 87. But this explanation contradicts the terms of the agreement, vague as they were, and is belied by the fact that the interval between the IRS's delivery of each waiver to Charles Mensik and its return was only a few days. Statement of Stipulated Facts, Nos. 3, 5. The court finds that Mrs. Mensik's explana-

---

4. The circumstances surrounding the change in Mary Mensik's testimony are most revealing. After testifying that she had never told her husband that he could sign documents for her, and that she did not know of any instance in which he had, Mrs. Mensik asked the attorneys at the deposition: "Is this pertaining to the—is this Internal Revenue or is it the Illinois investigation?" Mensik Dep. pp. 14–15. Mrs. Mensik was then shown a copy of the complaint. She was apprised that the parties involved were the Borchardts and the Mid-America National Bank of Chicago. Mensik Dep. pp. 16–18. Having determined that the government was seeking to foreclose against the Borchardts' property, and not her own, Mrs. Mensik's testimony changed markedly. From this point on she recounted numerous instances in which she asked her husband to sign her name to documents, thus contradicting her earlier testimony.

tion of the verbal power of attorney is incredible and must conclude that such an agreement never existed. Further support for this conclusion may be found in the conduct of Charles Mensik.

The government concedes that Charles Mensik repeatedly lied to the revenue officers concerning the signatures of Mary Mensik. In each instance Charles represented that his wife had personally signed the waivers. In fact, the government has been unable to establish who signed the name "Mary Mensik" to the tax collection waivers. Statement of Stipulated Facts, No. 10.

One must also inquire that if Mrs. Mensik had given her husband authority to execute tax collection waivers during her absence from Chicago, why did Charles Mensik go to such great lengths to induce revenue officers not to contact her directly, pleading her unfortunate "physical and mental condition." Lacey Dep. pp. 22, 40; Suzuki Dep. pp. 67–68, 70.

Finally, if Charles Mensik did possess the requisite authority to sign tax collection waivers on behalf of his wife, why was it that he never did so?· If there was any substance to the government's verbal power of attorney theory, Charles Mensik would have signed the waivers in his own hand.[5] It is evident that Charles Mensik's conduct was so inconsistent with the notion that he had his wife's power of attorney, that the court must conclude he did not have the requisite authority.

As alternative grounds for a finding in its favor, the government argues that Mary Mensik, through her deposition testimony, ratified the acts of Charles Mensik. The government's ratification theory is derived from Mrs. Mensik's testimony that she wanted her husband to obtain the tax lien waivers.

Aside from the inconsistencies in her testimony, see pp. 677–680, it is clear that Mrs. Mensik's purported ratification cannot serve to cut off the intervening rights of third persons. In Cook v. Tullis, 85 U.S. (18 Wall.) 332, 338, 21 L.Ed. 933 (1873), Justice Field stated:

> "The ratification operates upon the act ratified precisely as though authority to do the act had been previously given, except where the rights of third parties have intervened between the act and ratification." [6]

The Borchardts and Mid-America National Bank are third parties who acquired substantial property rights between the unauthorized acts of Charles Mensik and the purported ratification by Mary Mensik, and thus fit squarely within this exception. Moreover, Mary Mensik has long since relinquished all interest in the Oak Park property and it would be manifestly unjust to permit her to ratify her husband's actions where that ratification would redound solely to her benefit by imposing her tax liability on the Borchardts.

On grounds independent of the merits, defendants urge that the government should be dismissed pursuant to Rule 37, F.R.Civ.P., for failure to dis-

---

5. In an attempt to explain this discrepancy, the government asserts that "the circumstances are such that it must be concluded that [Charles Mensik] had another person perform the mechanical act of signing Mrs. Mensik's name to the waivers and that he adopted that third person's act as his own." Trial Memo of the United States, pp. 6–7. All that can be concluded from the evidence is that Charles Mensik consistently sought to prevent any contact between the IRS and his wife, and he consistently lied to achieve that result. Any inference beyond this is pure speculation and cannot support the government's theory.

6. *See* Restatement (Second) of Agency § 101(c) (1958); 2 Williston, Contracts § 278A (3d ed. 1959); C. H. Elle Construction Co. v. Western Casualty & Sur. Co., 294 F.2d 459, 463–464 (9th Cir. 1961), ("[Mecham] states: 'Nor will the principal by ratifying be permitted to impose substantial duties or obligations upon third persons which would not exist if ratification had not taken place.'"); Pape v. Home Insurance Co., 139 F.2d 231, 235 (2d Cir. 1943); *But cf.* United States v. Vassallo, Inc., 274 F.2d 791 (3d Cir. 1960).

close and produce certain documents. However, the sanctions set out in Rule 37 come into operation only upon the refusal of a party to obey an order of the court made under Rule 37(a). Wembley, Inc. v. Diplomat Tie Co., 216 F. Supp. 565, 573 (D.Md.1963); 8 Wright and Miller, Federal Practice and Procedure, § 2282, p. 757. No application for such an order was made by the defendants and, therefore, the court cannot grant the relief requested.

The foregoing Memorandum of Decision shall stand as this court's findings of fact and conclusions of law.

It is therefore ordered that judgment be, and it is hereby, rendered for defendants Gordon C. Borchardt, Mary A. Borchardt, and Mid-America National Bank of Chicago.

It is further ordered that the complaint be, and it is hereby, dismissed.

It is further ordered that costs be assessed against the plaintiffs.