**Andy Wallace BARNETT, Robert Taylor Newman and Jack Coleman Stewart, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 23165.

United States Court of Appeals Fifth Circuit.

Sept. 26, 1967.

Howard Dyer, Jr., Fred C. DeLong, Jr., James L. Robertson, Greenville, Miss., for appellants.

H. M. Ray, U. S. Atty., Oxford, Miss., Thomas G. Lilly, Special Asst. U. S. Atty., Jackson, Miss., for appellee.

Before RIVES, GEWIN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

Appellants Barnett, Newman and Stewart were tried under an indictment

with five substantive counts charging violation of 18 U.S.C.A. § 331[1] and a conspiracy count under 18 U.S.C.A. § 371.[2] Jury verdicts were returned finding Newman and Stewart guilty on all six counts and Barnett guilty only on the conspiracy count. All three appeal.

The United States Secret Service received information by affidavit that appellants planned a trip down the Ohio and Mississippi Rivers to New Orleans on a 37½ foot yacht, prophetically named the "Docket," and that the yacht would be used as the base of operations for altering mint marks and dates on coins which would be sold as rare collectors' items at various locations along the rivers. The Secret Service sought the assistance of the Coast Guard in finding the yacht.

Appellants began the trip, but the yacht ran aground on a sand bar near Tiptonville, Tennessee, where it remained for more than five weeks. Appellants incurred expenses which they failed to pay before leaving Tiptonville, as a result of which state warrants were issued from Lake County, Tennessee, on August 22, charging them with obtaining goods and services under false pretenses, felony offenses under Tennessee law.[3] On August 23 one of the unhappy creditors asked Deputy Sheriff Chadwick of Lake County for assistance in locating appellants. Deputy Chadwick called a number of local law enforcement officers at several points along the Mississippi River. The next day, August 24, many events happened. Chadwick called the Coast Guard in Memphis, requesting information on the boat. The Coast Guard notified the Secret Service of Chadwick's inquiry, and Secret Service Agent Miller phoned Chadwick, who apprised Miller of the state charges arising out of the yacht's sojourn at Tiptonville.

Miller then phoned Chief of Police Burnley at Greenville, Mississippi, and told him that the yacht was expected to pass Greenville and that one or more of the appellants reportedly were paralleling the yacht by land in a Kaiser automobile. He told Chief Burnley of the Lake County charges and indicated that Tennessee would extradite appellants if they were apprehended. In addition he indicated that appellants were involved in an investigation concerning altered coins and asked Chief Burnley to be on the lookout for evidence relating to such offenses.

Burnley made inquiry and learned that two men in a Kaiser had asked about the Docket at a boat store outside Greenville but within Washington County, Mississippi. He then called Deputy Fisher of the Washington County Sheriff's Office and the two proceeded in Chief Burnley's car to the area of the boat store, where they observed an automobile meeting the description of the Kaiser. They pulled it over and arrested the occupants, Newman and Stew-

---

1. "Whoever fraudulently alters, defaces, mutilates, impairs, diminishes, falsifies, scales, or lightens any of the coins coined at the mints of the United States, or any foreign coins which are by law made current or are in actual use or circulation as money within the United States; or

"Whoever fraudulently possesses, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or brings into the United States any such coin, knowing the same to be altered, defaced, mutilated, impaired, diminished, falsified, scaled, or lightened—

"Shall be fined not more than $2,000 or imprisoned not more than five years, or both."

2. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

3. Tenn.Code Ann. § 39–4226 (1956).

art. After placing the two in his car and beginning the trip back to Greenville, Chief Burnley radioed to one of his men to come and pick up the Kaiser. During the routine procedure of booking at the county jail a number of coins were taken from the pockets of Newman and Stewart. The charge on which they were booked was shown as "defrauding."

The Kaiser was driven to the jail, approximately five miles from the scene of the arrest, where Chief Burnley and Deputy Fisher conducted a thorough search of it, without a search warrant, and found several more coins plus various pieces of equipment of the sort used to alter coins. The search was made at a time variously described as 20 minutes after the arrest, an hour after the arrest, and within an hour after the booking. The place of search was at the jail parking lot. There were two justices of the peace who could have issued a search warrant with offices within a few yards of the scene of the search.

A call was placed to the Lake County Sheriff's Office, which responded with a telegram confirming the existence of the Tennessee warrants.

Chief Burnley then telephoned Agent Miller and told him that Newman and Stewart were in custody and had "certain paraphernalia"[4] in their possession. Miller and another agent, Taylor, came immediately to Greenville, stopping en route at Clarksdale, Mississippi, to procure a search warrant for the Docket. The agents were unable to locate the Docket that day.

The next morning, August 25, Agent Miller, using a rented airplane, sighted the yacht proceeding south between Vicksburg, and Natchez. He landed at Natchez and telephoned the Lake County Sheriff's Office requesting that a telegram be sent to the Adams County Sheriff's office at Natchez confirming the existence of the Tennessee warrants. This was done, and Adams County Deputy Bolls rented a boat, intercepted the Docket and arrested Barnett. When the arrest occurred Agents Miller, Taylor and Herman (from the Jackson, Mississippi, office) were at the Adams County Sheriff's Office. The Docket was tied up at the Natchez boat shore and Barnett taken to the Adams County jail. The federal agents, pursuant to a federal search warrant obtained by them from a county judge, searched the Docket and located several coins.

Taylor and Herman interviewed Barnett at the Adams County jail in Natchez. After being fully advised of his constitutional rights Barnett gave the agents a statement which admitted in substance that he was aware of alteration of coins by Newman and Stewart.

Taylor and Miller then returned to Greenville where Deputy Fisher turned over to them the material found during his search of the Kaiser. After obtaining what was described at the trial as "written waivers of constitutional rights" from Newman and Stewart, (the alleged waivers were not introduced and their contents never revealed), Taylor and Miller searched the auto again. Several additional items later introduced into evidence were found. Stewart and Newman were interviewed and, after being fully advised of their rights, gave extensive recorded statements admitting alteration of coins. Newman also revealed that while being transported from the scene of the arrest to the jail he had hidden in Chief Burnley's car a metal aspirin box containing coins. The officers removed the rear seat of Chief Burnley's car and found the coins.

On August 26, pursuant to waivers of extradition, appellants were turned over to a Lake County deputy sheriff and taken to the Lake County jail at Tiptonville. A preliminary hearing was held on the state charges on August 28, and all three appellants were bound over to await grand jury action. The same day Secret Service Agents, having con-

4. Chief Burnley testified that he and Deputy Fisher had found some coins, a small tool box, and some punches and dies.

ferred with their superiors, and then having been authorized by the United States Attorney's Office to file complaints, secured federal arrest warrants, reciting as probable cause the affidavit that had been in their possession since before the chase down the Mississippi began. Detainer warrants were secured to hold appellants for federal authorities after state custody terminated. Stewart made bond on the state charge, on September 1 was arrested on the federal charge, and was taken before a commissioner soon thereafter. He made no statements.

Newman and Barnett did not make state bonds until September 30, at which time they were arrested on the federal warrants and taken before a commissioner. However, in the interim, after federal warrants were issued, they had been subjected to further questioning at the Lake County jail by Agent Taylor. He interviewed Barnett at least once and obtained a statement on August 31, Newman at least once and possibly two or three times and secured a statement from him on September 15.

Before trial motions to suppress were made as to the statements given by each appellant, the coins and paraphernalia seized in the searches of the automobile, and coins taken from appellants during the booking procedure. The motions were denied and all these items offered and received in evidence at trial. Expert testimony was produced that three of the coins in the metal box which Newman had left in Chief Burnley's car and two of those taken from the Kaiser automobile were genuine United States coins and that on each either the mint mark or the date was altered.

Of the numerous grounds for reversal urged by appellants, we find it necessary to discuss only the following.

**1. Failure to allege and prove offense**

The indictment alleged that appellants conspired to fraudulently alter genuine United States coins and to fraudulently possess and "pass, alter, publish and sell" such altered coins "with intent to defraud coin collectors." The substantive counts described alterations of the mint marks or dates of five specific coins. Proof introduced at trial by the government tended to establish the facts alleged, but no proof was offered that the alterations in any way affected the value of the coins as currency or were intended to do so. At the close of the government's case appellants moved for a verdict of acquittal on the ground that neither the indictment nor the proof made out violations of 18 U.S. C.A. § 331.[5] We agree with the District Court that violations of § 331 were alleged and proved.

The acts charged and proved come within the literal language of the statute, which prohibits fraudulent possession of any coin knowing it to have been altered. Appellants rely on the theory that the acts while within the language of the statute are not within its prohibition because the intent or spirit of § 331 restricts its application to fraudulent alterations affecting the value of coins as legal tender.[6] However, they have failed to establish that the spirit of the statute is so restricted.

The interpretation of an analogous statute relating to the alteration of any obligation or security of the United States, 18 U.S.C.A. § 471, suggests that § 331 must be literally read and applied. In Foster v. United States, 76 F.2d 183 (10th Cir. 1935), it was held that the statute covered the alteration of serial numbers of five dollar bills as part of a scheme to convince a victim that the defendants were able, through a chemical

---

**5.** Failure of the indictment to charge an offense "shall be noticed by the court at any time during the pendency of the proceeding." Fed.R.Crim.P. 12(b) (2).

**6.** "It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226, 228 (1892). See also Wilson v. United States, 125 U.S.App.D.C. 153, 369 F.2d 198 (1966).

and rolling process, to duplicate currency (for which purpose they needed several bills with identical serial numbers). In holding that alteration of bills in this way and for this purpose violated the statute, the court stated:

"The alteration need not be one which destroys or impairs the validity of the obligation. It is enough if an alteration is made in furtherance of a scheme to defraud and it is not necessary that the United States be the intended or actual victim of the scheme. An alteration made as a material part of a scheme to defraud any person comes within the terms of the statute." 76 F.2d at 184.

Cf. United States v. Rabinowitz, 176 F.2d 732 (2d Cir. 1949), rev'd on other grounds, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).[7]

■■ We conclude that the "fraudulent alteration" prohibited by § 331 includes any alteration, whether or not affecting the legal tender value or utility of the coin, which is made with intent to defraud the United States, any person or group of persons or organizations.[8]

2. Detention illegal under state law

It is contended that appellants were invalidly detained under Mississippi law and that this made inadmissible the fruits of the federal interrogation and the searches of the automobile and of appellants' persons. This is without merit.

a. Validity of arrest

■■ Appellants urge that Deputy Fisher had no personal knowledge that the Tennessee warrants were outstanding, that they charged felony offenses, or that appellants could or would be extradited, hence he did not have sufficient basis for an arrest without a warrant under Mississippi law. Under the law of that state an officer may arrest an individual on the basis of reasonable information that the accused has committed an offense in another jurisdiction. Loper v. Dees, 210 Miss. 402, 49 So.2d 718 (1951).

■■■ Agent Miller testified that he told Chief Burnley Tennessee warrants charging "fraudulent breach of trust and larceny after trust" were outstanding and that he indicated Tennessee was interested in extraditing appellants. Chief Burnley testified that he told Deputy Fisher warrants charging appellants with "larceny" had been issued; he related, "I assumed * * *—and I'm sure I told him that I assumed—they was extraditable." The information which Fisher received was sufficient to justify an arrest for the purpose of detaining appellants until further information on the Tennessee charges could be obtained. Such information immediately was sought by a telephone call to the Lake County Sheriff's Office and was obtained in the form of a telegram confirming the existence of the warrants.[9]

b. The booking

■■ Collins v. United States, 289 F.2d 129 (5th Cir. 1961), and Staples v. United States, 320 F.2d 817 (5th Cir. 1963), do not make illegal the detention of Newman and Stewart. True, they were booked for "defrauding," which does not constitute a recognizable crime under state law. But Collins and Staples involved bookings for "investigation" and "on suspicion," and the holdings were

---

7. Compare 18 U.S.C.A. § 332, which specifically prohibits altering the proportion of gold or silver contained in coins; this section clearly seems to be directed at "alterations" affecting the value of the coin as legal tender.

8. It follows, of course, that an intent to use the altered coins to deceive those purchasing them for their value as collectors' items is a sufficient fraudulent intent within the meaning of the statute.

9. The arresting officers did not, until some time after the arrest, formally inform Newman and Stewart of the cause for the arrest. Under Mississippi law this did not invalidate the arrest, Fuqua v. State, 246 Miss. 191, 145 So.2d 152 (1962), but merely shifted to the prosecution the burden of proof on the issue of probable cause, Clay v. State, Miss., 184 So. 2d 403 (1966).

aimed at police practices under which subjects were detained on these fictitious charges until additional investigation could be carried out. See discussion in Manuel v. United States, 5 Cir., 355 F.2d 344 at 348. Newman and Stewart were arrested for the specific purpose of holding them for Tennessee authorities, and they were so informed during the trip from the scene of the arrest to Greenville. Where a valid basis for arrest and detention exists, is relied upon by the arresting officers and is communicated to the arrestees, the use by the jailer of an imprecise term to describe the basis for detention will not invalidate that detention.

### c. Failure to take before state magistrate

We turn next to whether failure of the Mississippi officers to take appellants before a state magistrate requires exclusion of the fruits of the interrogation by the federal officers. The government urges that the officers had no obligation under state law to take appellants before a magistrate and, in the alternative, that failure to comply with such requirement as did exist did not affect the admissibility of statements given federal officers. Since we agree with the latter we need not discuss the former.[10]

Evidence seized in violation of a defendant's constitutional rights by state officers is not admissible in federal trials; admissibility is determined as if the seizure had been made by federal officers. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). It may be contended that in the absence of a requirement of prompt presentation before a magistrate, or some equivalent opportunity for disinterested determination of the justification for continued detention, such detention amounts to an unreasonable seizure of the person within the meaning of the Fourth Amendment or a deprivation of liberty without due process within the Fifth Amendment. Nevertheless the right of one arrested without a warrant to prompt presentation before a magistrate has not been determined to be of constitutional dimensions.

For persons in state custody the right has its basis in state law. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The "McNabb rule," requiring exclusion of statements obtained during a period of detention in violation of Rule 5(a), Fed. R.Crim.P.,[11] has no application to failure to take the accused before a state magistrate. Detention of appellants by state officers on a proper state charge but in violation of a state requirement that they be taken before a magistrate—if there was such requirement—does not as a matter of law require suppression in federal court of the fruits of interrogation by federal officers as to an unrelated offense.[12] Horne v. United States, 246 F.2d 83 (5th Cir.) cert. denied, 355 U.S. 878, 78 S.Ct. 143, 2 L.Ed.2d 109 (1957).

### 3. Violation of Rule 5(a)

Appellants urge that because of the close cooperation between state and federal officials the custody should have been considered as federal and the Mc-

---

10. As a general rule a fugitive from another state arrested without a warrant must be taken immediately before a magistrate. Great American Indemnity Co. v. Beverly, 150 F.Supp. 134, 140 (M.D. Ga.1956). See Uniform Criminal Extradition Act § 10.

11. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948); Mal-

lory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

12. Statements so obtained may be subject to attack for involuntariness, or on grounds of invalid cooperation between state and federal officers (discussed in part 3, infra), in which case the defect is failure to take the accused before a federal commissioner, not failure to comply with state requirements.

Nabb rule [13] applied to exclude all fruits of federal interrogation conducted after the limited "reasonable" period following arrest which Rule 5(a) allows for presentation before a commissioner. This argument has been made frequently in this and other circuits with almost uniform lack of success.[14] These attempts all seek to find present vitality in Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943), decided the same day as McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

In *Anderson*, a local sheriff, "on his own initiative," took petitioners into custody in violation of state law and held them for six days without taking them before a magistrate, as required by state law. During this time federal officers "intermittently" questioned petitioners. Noting that the case was governed by the same considerations as *McNabb*, the Court held the resulting confessions inadmissible:

> "There was a working arrangement between the federal officers and the sheriff * * * which made possible the abuses * * *. Therefore, the fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they

secured improperly through combination with state officers." 318 U.S. at 356, 63 S.Ct. at 602.

Soon after the *Anderson* and *McNabb* decisions the Federal Rules of of Criminal Procedure were formally adopted. In Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948), the *McNabb* holding was combined with Rule 5(a) to require the exclusion from federal courts of any statement taken from a subject being detained in federal custody in violation of Rule 5(a). Attempts to use *Anderson* in combination with Rule 5(a) have met with less success. To bring Rule 5(a) into play there must be detention "by or at the instance of federal officers." White v. United States, 200 F.2d 509, 513 (5th Cir. 1952). The cases agree that federal agents properly may interrogate subjects held in state custody although the subjects are not first taken before a federal commissioner in compliance with Rule 5(a) (or before a state magistrate, even when required by state law). The Rule 5(a) period is measured beginning after state authorities surrender custody and at the time federal officials effect their arrest on the federal charges. However, where federal interrogation of subjects in state custody is pursuant to cooperative activity of the state and federal

---

13. Footnote 11, supra.

14. E. g., Barnes v. United States, 374 F. 2d 126 (5th Cir. 1967); Lovelace v. United States, 357 F.2d 306 (5th Cir. 1966); Papworth v. United States, 256 F.2d 125 (5th Cir.), cert. denied, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88 (1958); Brown v. United States, 228 F.2d 286 (5th Cir. 1955), cert. denied, 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956); White v. United States, 200 F.2d 509 (5th Cir. 1952); Tucker v. United States, 375 F.2d 363 (8th Cir. 1967); Young v. United States, 344 F. 2d 1006 (8th Cir.), cert. denied, 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105 (1965); United States v. Gorman, 355 F.2d 151 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966); United States v. Coppola, 281 F.2d 340 (2d Cir. 1960), aff'd per curiam, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961); Easley v. United States, 333 F.2d 75 (10th Cir. 1964); Cram v. United States, 316 F.2d 542 (10th Cir. 1963); United States v. Close, 349 F.2d 841 (4th Cir. 1965), cert. denied, 382 U.S. 992, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966); Cote v. United States, 357 F. 2d 789 (9th Cir.), cert. denied, 385 U.S. 883, 87 S.Ct. 173, 17 L.Ed.2d 110 (1966); Burke v. United States, 328 F.2d 399 (1st Cir.), cert. denied, 379 U.S. 849, 85 S.Ct. 91, 13 L.Ed.2d 52 (1964); Westover v. United States, 342 F.2d 684 (9th Cir. 1965), rev'd on other grounds, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Sailer, 309 F. 2d 541 (6th Cir. 1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1884, 10 L.Ed.2d 1057 (1963). Compare United States v. Tupper, 168 F.Supp. 907 (W.D.Mo.1958), where statements made to federal officers by subjects in state custody were suppressed in reliance on Anderson.

officers constituting a "working relationship" as condemned by *Anderson* the purported state custody is to be deemed federal custody and the "reasonableness" of the delay measured accordingly.[15] The difficulty is in defining the type of "working relationship" condemned by *Anderson*. "Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged." Elkins v. United States, 364 U.S. 206, 221, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669, 1680 (1960). But this cooperation cannot be used to dilute the requirements imposed by the Federal Rules of Criminal Procedure. The issue generally is phrased as whether the cooperation amounts to "collaboration to achieve an unlawful end," United States v. Coppola, 281 F.2d 340, 344 (2d Cir. 1960) (en banc), aff'd per curiam, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961), or "collusion between federal and state officials in frustrating [the subject's] * * * right to prompt arraignment," Lovelace v. United States, 357 F.2d 306, 310 (5th Cir. 1966). The necessary inquiry is whether the cooperation between state and federal officials had as its purpose a mere interchange of information and resources between two legitimate investigations, one state and the other federal, or to permit in-custody investigation and interrogation by federal officials without compliance with Rule 5(a). The purpose must be determined objectively from all surrounding circumstances. A high degree of co-operation by state officials in making the subjects available for interrogation by federal officers is not conclusive. White v. United States, supra. Nor is it controlling that the individuals were taken into state custody because of information furnished to state officials by federal officers, although it is relevant that federal officers stimulated the state investigation. United States v. Coppola, supra.[16] However, the existence of a legitimate state investigation for a suspected state offense is essential to a valid purpose, and it is important whether or not state officials will proceed with further action on the state charge independent of the outcome of the federal investigation. United States v. Tupper, 168 F.Supp. 907 (W.D. Mo. 1958).

■ In this case the federal officers affirmatively encouraged and assisted state officers in taking appellants into custody on the state charges and when appellants were in custody freely took advantage of the situation to interrogate and to search for physical evidence relating only to the suspected federal offense. On the other hand the federal and state investigations began separately and proceeded concurrently and cooperatively only after the Secret Service learned through the Coast Guard that Tennessee officers also were searching for appellants. It was not established that had the federal agency not taken part in the operation appellants would not have been sought and, if located, arrested and de-

---

15. Thus a statement taken before "unreasonable delay" is not excluded, even if the custody is deemed to be within the *Anderson* rule. See United States v. Thompson, 356 F.2d 216, 224–245 (2d Cir. 1965).

16. In *Coppola*, the statement of facts by the Second Circuit shows that federal officers told the state agency that the suspects (who were under investigation by the F.B.I. concerning several bank robberies) had committed a robbery of a small butcher-shop and were contemplating another similar crime; information as to where to apprehend the subjects was also given to the state officers. The Second Circuit emphasized the absence of any collaboration to achieve an unlawful end, but implied that it considered the state detention on that "Federal officials did not induce and were powerless to prevent." 281 F.2d at 345. The Supreme Court granted certiorari "believing that [the case] presented a question under Anderson v. United States." But after oral argument and examination of the transcripts, the Court affirmed per curiam with the terse comment that "the particular facts of the case are not ruled by Anderson." 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79, 80 (1961). Compare the emphasis in Papworth v. United States, supra, on whether the state arrests were made upon inducement by federal officers.

tained and returned to Tennessee. To the contrary, the Tennessee state officers were diligently seeking to locate appellants, at the behest of local citizens, before becoming aware of the concurrent interest of federal authorities in the missing yachtsmen.[17] There is no evidence that return of the prisoners to Tennessee was delayed at the request of, or to accommodate, federal officers. That the investigation and search by each force of law enforcement officers was made more effective by the cooperation of the other is highly desirable and does not make the federal interrogation invalid.

■ The burden was on appellants to prove a violation of Rule 5(a), White v. United States, supra; Joseph v. United States, 239 F.2d 524 (5th Cir. 1957). Appellants failed to prove an unlawful purpose underlying the cooperative activity between the federal and state officers and consequently failed to establish a violation of Rule 5(a).

We have considered also the statements obtained from Newman and Barnett in the Tiptonville jail after issuance of the federal warrants. By the issuance of the warrants the federal officers evidenced that they thought there was a case against appellants, but they continued to interrogate and take statements from the two who remained in state custody. However, Rule 5(a) comes into effect when the accused is arrested on the federal charge, and has no application to state custody in the absence of an improper purpose in the federal-state cooperation, and we have concluded there was no such impropriety in this case.[18]

### 4. Search of the automobile

Appellants say that under Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), search of their automobile by Chief Burnley and Deputy Fisher was in violation of the Fourth Amendment so that the physical objects taken in this search, as well as the statements made after appellants had knowledge of the search, should have been suppressed.

■ There can no longer be any doubt that the Fourth Amendment's requirement of reasonableness demands that a valid search warrant be obtained prior to a search unless the situation comes within one of the "carefully defined classes of cases" constituting exceptions to the general warrant requirement. Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, 935 (1967); United States v. Ventresca, 380 U.S. 102, 106–107, 85 S.Ct. 741, 744–745, 13 L.Ed.2d 684, 688 (1965); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). The burden is on one invoking an exception to the warrant requirement to produce facts bringing the case within the exception. Weaver v. United States, 295 F.2d 360, 361 (5th Cir., 1961).

■ The search in this case cannot be justified as a warrantless search of a moving vehicle. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The state officers did not have probable cause to believe the vehicle contained contraband subject to seizure; a search of a moving vehicle may not be conducted on mere suspicion. Staples v. United States, 320 F.2d 817, 820 (5th Cir. 1963). Moreover, the vehicle was stopped for the purpose of effecting an arrest of Newman and Stewart; the search was not made until later when the automobile was in the custody of the police. This is not a case of it

---

17. The record is silent on disposition of the state charges, except for an implication that ultimately the aggrieved Tennessee creditors were paid and the state charges dropped.

18. Cf. United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951), in federal custody on one charge, interrogated on a second federal charge: Morgan v. United States, 111 U.S.App.D.C. 127, 294 F.2d 911 (1961); Edmonds v. United States, 106 U.S.App.D.C. 373, 273 F.2d 108 (1959); Birnbaum v. United States, 356 F.2d 856 (8th Cir. 1966).

being "not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Carroll v. United States, 267 U.S. at 153, 45 S.Ct. at 285. If the search can be justified it is only on the theory it was incident to the arrest of Newman and Stewart.

In *Preston* petitioners were arrested while seated in an automobile in a business district at 4:00 a. m., searched for weapons and taken to police headquarters. Their car was driven by an officer to the station, then towed to a garage. "Soon after" petitioners had been booked, officers went to the garage and searched the car. The court, assuming that the officers had a right to search the car at the time of the arrest, held that this did not establish a right incident to the arrest to search in the manner described: "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 376 U.S. at 367, 84 S.Ct. at 883.

Subsequent development of the *Preston* rule has not been without difficulty. In numerous cases the courts have held searches of automobiles conducted at the time and place of arrest ("contemporaneous searches") to be pursuant to the arrest.[19] In other cases where search has been widely separated in time and location from the arrest, the search has been condemned.[20] In intermediate situations the courts have differed. Thus United States v. Cain, 332 F.2d 999 (6th Cir.

1964), held invalid a search of a car taken to police headquarters, conducted about two hours after the arrests. In Sisk v. Lane, 331 F.2d 235 (7th Cir. 1964), petition for cert. dismissed, 380 U.S. 959, 85 S.Ct. 1100, 13. L.Ed.2d 977 (1965), the Seventh Circuit indicated that a search of an auto towed to police headquarters, conducted immediately after the arrival of the car, was in violation of *Preston*, and in United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966), a search at police headquarters eight hours after arrest was struck down. But in Arwine v. Bannan, 346 F.2d 458 (6th Cir.), cert. denied, 382 U.S. 882, 86 S.Ct. 175, 15 L.Ed.2d 123 (1965), a search at police headquarters was upheld where the defendant, after arrest, had remained in the car while it was being driven to headquarters and the search was begun immediately upon arrival at the station. And in Price v. United States, 121 U.S. App.D.C. 62, 348 F.2d 68, cert. denied, 382 U.S. 888, 86 S.Ct. 170, 15 L.Ed.2d 125 (1965), a search at a police station was upheld where it was begun as soon as the car was driven to the station and the officers, at the time of the arrest, had seen the objects for which the search was conducted. The court commented, "The seizure * * * is not obscured by the failure of the officers to take these articles from the car at the time of the arrest instead of waiting until the car in which they visibly reposed reached the station." 348 F.2d at 70.

 In this case the search was conducted at a location five miles from the

19. United States v. Jones, 340 F.2d 913 (7th Cir. 1965); Adams v. United States, 118 U.S.App.D.C. 364, 336 F.2d 752 (D.C.Cir.1964); Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966); Welch v. United States, 361 F. 2d 214 (10th Cir. 1966); United States v. Gorman, 355 F.2d 151 (2d Cir. 1965); United States v. Yant, 373 F.2d 543 (6th Cir. 1967). Searches also have been upheld in light of unusual circumstances that make them "reasonable." Caldwell v. United States, 338 F.2d 385 (8th Cir. 1964) [search of vehicle abandoned by fleeing felon upheld]; Boyden v. United States, 363 F.2d 551 (9th Cir. 1966) [danger of fire because of spilled gaso-

line held to justify search of overturned automobile after arrestee removed].

20. Westover v. United States, 342 F.2d 684 (9th Cir. 1965) [search made day following arrest, in storage lot]; Smith v. United States, 118 U.S.App.D.C. 235, 335 F.2d 270 (D.C.Cir. 1964) [search conducted following day in private garage under police control]. Compare Thompson v. United States, 342 F.2d 137 (5th Cir. 1965), where the defendant got into a second car and proceeded short distance from the first car at which point he was arrested and returned to the first car, where a search was conducted (and upheld).

scene of arrest and from twenty minutes to more than an hour after the arrests, and after appellants had been booked and put in cells. The government makes generalized assertions that an immediate search was necessary because Barnett had not been apprehended and might have attempted to reach the car, but there is no evidence that the car was not secure in the jail parking lot a few feet from the jail itself. In addition, the car previously (though briefly) had been left unattended at the arrest site. If insecure it could, on the facts of this case, have been safeguarded for the brief time necessary to seek a search warrant from one of the justices of the peace whose offices were likewise a few paces distant.

■ Other factors also point to the conclusion that the search was not "reasonable" within the meaning of the Fourth Amendment. The purpose was not to locate anything related to the charges for which appellants were arrested. Chief Burnley had been requested by the Secret Service to be on the lookout for evidence of the coin charges. There was adequate opportunity to obtain a search warrant. The extent to which such an opportunity will invalidate a warrantless search is not entirely clear. Compare Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), with United States

v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). But we recently held that "the practicability, under the circumstances, of submitting evidence which may justify a search to a magistrate, for his independent determination, is a significant factor [in determining the reasonableness of a search of an automobile]." Williams v. United States, 382 F.2d 48 (5th Cir. 1967). See also Rent v. United States, 209 F.2d 893 (5th Cir. 1954). Deputy Fisher testified with laudatory candor that he had no specific idea of what he was looking for and that he would have been unable to list the items sought with sufficient specificity to secure a warrant for the search. The search was a general exploratory one made for evidence of a charge as to which the officers had, at the most, mere suspicion.

Under all the circumstances the government did not sustain its burden of showing that the search was incident to the arrest of appellants or that it came under any other exception to the Fourth Amendment's general requirement of a warrant prior to search.[21]

■ Our ruling requires exclusion of the fruits of the automobile search made at the jail parking lot. It does not affect evidence taken during the searches of the appellants' persons and the search of the yacht. However, our

21. A different result is not required by Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). In Cooper, the arrest was made for a narcotics violation, and state law directed the arresting officer to seize any car used to transport illicit narcotic drugs. In view of the nature of police custody of the car the Court held that a search pursuant to this custody was not constitutionally unreasonable. 49 U.S.C.A. § 782 authorizes seizure of automobiles used to transport or conceal contraband; contraband is defined in 49 U.S.C.A. § 781 as including "any * * * altered * * * coin * * * of the United States." Under certain circumstances, seizure pursuant to these sections may authorize search of a vehicle without a warrant. Drummond v. United States, 350 F.2d 983 (8th Cir. 1965), cert. denied, 384 U.S. 944, 86 S.Ct. 1469, 16

L.Ed.2d 542 (1966); Burge v. United States, 342 F.2d 408 (9th Cir.), cert. denied, 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965). Cf. United States v. Haith, 297 F.2d 65 (4th Cir. 1961), cert. denied, 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962).

But here appellants' arrest was on the Tennessee charges. As in *Preston,* "[t]he fact that the police had custody of [their] * * * car was totally unrelated to the * * * charge for which they arrested him. So was their subsequent search of the car." Cooper v. State of California, supra, 87 S.Ct. at 791, 17 L.Ed.2d at 733. Thus we need not consider (nor has it been argued) whether custody of appellants' car can be construed as being pursuant to 49 U.S.C.A. § 781–83 and the search consequently valid under *Cooper.*

ruling may affect the admissibility of all the statements given by Newman, Stewart and Barnett subsequent to the search. If the evidence seized in the unlawful search "induced"[22] or "triggered"[23] any of their subsequent incriminating statements, the statements thus affected would be so related to the illegal activity as to be inadmissible. If Newman's statement as to the location of the box and coins in Chief Burnley's car was related in the same way to the illegal search, the items found in the police vehicle may be inadmissible. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Cf. Staples v. United States, 320 F.2d 817, 820 (5th Cir. 1963). The same problem exists with regard to obtaining the consent of Newman and Stewart (if it was obtained) to the search of the automobile made by the Secret Service Agents at Greenville. On the other hand it may be that some or all of the statements, and the consent to the second automobile search, were induced by the knowledge of the legitimate evidence the federal agency had accumulated and thus were unrelated in a legal sense to the search of the automobile. These are complex factual issues best dealt with by the District Court on retrial.[24]

■ The failure to suppress the evidence from the search of the automobile by the state officers requires reversal as to all three appellants. Barnett's interest in the automobile is not clear from the record, but even if the search did not invade his constitutional rights he was sufficiently prejudiced by the introduction of the fruits of this search to require reversal under the rule of McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). See Gillespie v. United States, 368 F.2d 1, 6–7 (8th Cir. 1966); Rosencranz v. United States, 334 F.2d 738 (1st Cir. 1964); Schoeneman v. United States, 115 U.S.App.D.C. 110, 317 F.2d 173, 174 n. 5 (1963); Hair v. United States, 110 U.S. App.D.C. 153, 289 F.2d 894 (1961); United States v. Tomaiolo, 249 F.2d 683, 696 (2d Cir. 1957).

Reversed and remanded.

22. Hall v. Warden, Maryland Penitentiary, 313 F.2d 483, 490 (4th Cir.), cert. denied, 374 U.S. 809, 83 S.Ct. 1693, 10 L.Ed.2d 1032 (1963).

23. United States v. Nikrasch, 367 F.2d at 744.

24. Because of the disposition we make of the case we need not consider Newman's argument that the failure to permit his attorney to inspect before trial written and recorded statements made by Newman was a violation of Rule 16 and a deprivation of due process. See Leland v. State of Oregon, 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302, 1310 (1952); Cicenia v. La Gay, 357 U.S. 504, 510–511, 78 S.Ct. 1297, 1301, 2 L.Ed.2d 1523, 1528–1529 (1959). On retrial the more liberal provisions of amended Rule 16 will apply. See generally Reznick, The New Federal Rules of Criminal Procedure, 54 Geo.L.J. 1276, 1277 (1966).

Also we need not discuss in detail questions of admissibility of evidence of possession of coins which an expert told the trial court in chambers were counterfeit. It was not revealed to the jury that they were counterfeit. That they had been altered was admissible to show intent, purpose or motive, e. g., Pardo v. United States, 369 F.2d 922 (5th Cir. 1966), and the jury was carefully instructed to consider the testimony only on the issue of intent. The trial judge has a measure of discretion as to admitting such evidence, Glasser v. United States, 315 U.S. 60, 81, 62 S.Ct. 457, 86 L.Ed. 680, 705 (1942), and it was not abused here.

In view of the conspiracy count, the same is true of evidence of a previous sale of coins made by Newman to a coin dealer, which the dealer could not identify as either altered or not altered.