UNITED STATES of America ex rel.
Oscar Lee CHENNAULT,
Petitioner,

v.

Harold J. SMITH, Warden, Attica Correctional Facility, et al.,
Respondents.

No. 71 C 1588.

United States District Court,
E. D. New York.

Oct. 25, 1973.

Oscar Lee Chennault, pro se.

Louis J. Lefkowitz, Atty. Gen. of N. Y. by Robert S. Hammer, Asst.Atty. Gen., New York City, for respondents.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioner Oscar Lee Chennault, presently incarcerated in the Attica Correctional Facility, applies for a writ of habeas corpus claiming that his conviction of grand larceny first degree after a jury trial in the New York Supreme Court, Queens County, on April 9, 1964 is constitutionally invalid. He was sentenced to imprisonment for five to ten years which he has begun serving after recently completing an apparently unrelated federal sentence.[1] On May 21,

---

1. When this petition was filed petitioner, then in federal prison in Atlanta, Georgia, was also in "custody" of the State of New York under an outstanding detainer warrant on the Queens conviction and thus eligible to challenge that conviction in a federal habeas corpus proceeding. United States ex rel. Meadows v. New York, 426 F.2d 1176 (2 Cir. 1970); cert. denied, 401 U.S. 941, 91 S.Ct. 944, 28 L.Ed.2d 222 (1971). Under Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), this court had jurisdiction over petitioner's application.

1964 his conviction was affirmed by the Appellate Division without opinion, People v. Chennault, 25 A.D.2d 718, 268 N.Y.S.2d 558 (2d Dept. 1966), and subsequently by the Court of Appeals in an opinion which, however directed a *Huntley*[2] hearing to determine the voluntariness of incriminating statements made by petitioner to the police, People v. Chennault, 20 N.Y.2d 518, 285 N.Y.S.2d 289, 232 N.E.2d 324 (1967). Chief Judge Fuld and Judge Breitel, dissenting, voted to reverse and order a new trial on the ground that petitioner's conviction "was based upon inculpatory statements stemming from evidence concededly illegally obtained." 285 N.Y.S.2d at 292, 232 N.E.2d at 326. Following the *Huntley* hearing held in February 1968, the trial court found that petitioner's statements to the police were made voluntarily. The Appellate Division affirmed again without opinion, 32 A.D.2d 893, 302 N.Y.S.2d 740 (2d Dept. 1969). It is unclear from the papers whether leave to appeal to the Court of Appeals was subsequently sought and denied.

Petitioner's attack on his conviction focuses mainly on the constitutional defect noted by Chief Judge Fuld in People v. Chennault, *supra*, viz.,

. . . the defendant's incriminating statements stemmed directly from the use of the illegally seized articles, and, accordingly, his admission should not have been received and used as evidence against him. 285 N.Y.S.2d at 294, 232 N.E.2d at 327.

Although facts relevant to that issue appear in the Court of Appeals opinions, a chronological restatement of the history of the case gleaned from State court records seems desirable in view of petitioner's broadscale challenge to the fundamental fairness of the proceedings against him.

On the morning of September 20, 1963 a man wearing clerical garb walked into the office of Montauk Freightways in Queens and asked the manager for a donation. After being refused, the man walked out. Shortly thereafter the company's bookkeeper noticed that the daily bank deposit pouch, containing the previous day's receipts of cash and checks, was missing from the top of a file cabinet located just outside the manager's office. The bookkeeper called this to the manager's attention and when a search failed to turn up the pouch, the loss was reported to the police. The manager and bookkeeper testified at petitioner's trials and identified him as the minister. Neither could, of course, say he had taken the pouch but the bookkeeper was able to identify a check made out to cash, hereinafter referred to, as part of its contents.

Petitioner came to the attention of the police on the afternoon of September 20, 1963 as the result of what the record indicates to be a false alarm. At about 3:00 p. m. that day two radio car policemen responded to a call concerning a possible holdup in a Brooklyn hotel. The hotel clerk pointed out petitioner, who was in the hotel lobby, as a man she claimed had previously attempted to hold her up at the hotel and said she feared another holdup. According to the investigating officer, however, "then she changed her mind and said she wasn't too sure."[3] The clerk also told the officer there was another man in the washroom, adjacent to the lobby. The policeman investigated and found an unidentified man washing his hands, whom he turned over to his fellow officer. He then returned to the washroom and discovered a check lying on a windowsill. The check was subsequently identified by the bookkeeper of Montauk Freightways as having been in the pouch stolen earlier that day. The officer testified in a suppression hearing that at the time he had no knowledge or information that the check pertained to a crime and that he had never seen petitioner in

2. People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

3. Transcript of Hearing to Suppress Evidence, January 27, 1964, p. 5.

the washroom. Nor does the record show any link between petitioner and the unidentified man found in the washroom.

Petitioner and the other man were frisked and taken in the patrol car to the 80th precinct in Brooklyn "for investigation only" on the hotel clerk's complaint. Neither man was questioned by the policemen, both of whom retired from the scene when their tour of duty ended at 4:00 p. m. A car belonging to petitioner, parked near the hotel, was driven by one officer to the 80th precinct, where it was . subsequently searched without a search warrant. The search produced a valise containing clerical garb as well as a card identifying petitioner as a member of the ministry. According to the detaining officer, everything was turned over to the 80th precinct's detective squad which took charge of the matter.

The record is blank as to what occurred in the 80th precinct while petitioner was detained there from 4 p. m. until he was turned over to Queens detectives several hours later that evening. Detective Greene of Queens, who was in charge of the Montauk Freightways theft investigation, testified in a pretrial suppression hearing that he first saw petitioner in Queens about 11 p. m. on September 20, 1963. This was after he "received a call from some detectives in Brooklyn precinct. They informed me that they had this Chennault and that he had a check on him that belonged to the Montauk Trucking Co." [4] Greene denied being informed by the Brooklyn detectives that petitioner had made any statements about the case but acknowledged that the check, a suitcase or valise containing a clerical collar, and

$42 cash, apparently taken from petitioner, was sent out from Brooklyn.

Detective Greene testified he interrogated petitioner for approximately 30 to 45 minutes in the squad room of the 114th precinct in Queens. So far as appears from the record, this was the first interrogation of petitioner by the police. Petitioner had then been in police custody for over seven hours, although he had not been arrested. The interrogation was conducted in plain view of the items illegally seized from petitioner's car, some of which were lying on the desk in the squad room. Petitioner was first questioned about the clerical garb seized from the automobile, as to which he made certain admissions.[5] He was booked for the Montauk Freightways theft at 2 a. m. on September 21 and arraigned on a grand jury indictment on October 28, 1963.

A suppression hearing was held on January 27, 1964, and a first trial before a second judge ended in a mistrial on March 3, 1964 before submission to the jury. A second suppression hearing was held on April 7, 1964. He was retried before another jury and a third trial judge on April 8, and 9, 1964 and found guilty of the theft. At both suppression hearings prior to these trials the articles found in petitioner's car were ruled to have been illegally seized and· not admissible as evidence of the prosecution's case. Consequently, petitioner's oral admissions as to the contents of the vehicle were also excluded. The check, however, was held not to be the subject of an illegal search and seizure and, hence, admissible, along with petitioner's oral statements relating thereto.[6]

4. Transcript of Hearing on Motion to Suppress Evidence, April 7, 1964, p. 33.

5. Id. at 35–37.

6. The trial court permitted Detective Greene to testify over defense objection as follows:
"Q Now, officer, I show you People's Exhibit 1 for Identification and I ask you, do you recognize it? [Referring to the check.]

"A Yes, sir.
"Q Officer, did you have a conversation with this defendant regarding [the check]?
"A Yes, sir.
"Q State to the Court and jury what you said to him and what he said to you.
"A I asked the defendant where he obtained the check. He informed me that on the morning of the 20th, between 10

While not disputing the admissibility of the check per se, petitioner contends that his admissions to Detective Greene relating thereto should have been excluded because (1) they were the tainted fruit of illegally obtained admissions relating to the unlawfully seized clerical garb and identification card; (2) they were made without benefit of counsel; and (3) they were attributable to coercive circumstances surrounding his detention and formal arrest, as well as unreasonable delays in booking and arraignment.

■■ As already noted, petitioner's first and principal contention stated above was flatly rejected by a divided New York Court of Appeals in People v. Chennault, *supra*. That Court's majority determination that the admissions relating to the check were not excludable does not necessarily bind this court. Townsend, v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963).[7] See also Note, Developments in the Law, Federal Habeas Corpus, 83 Harvard L. Rev. 1038, 1121–40 (1970). If this court's independent review of the record presented by the State reveals a reasonable possibility that petitioner's conviction resulted from a violation of his federal constitutional rights, that conviction cannot stand. Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

■ Ever since Mapp v. Ohio, 367 U. S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which predated petitioner's arrest, State as well as federal prosecutions have been subject to the so-called "exclusionary rule", which forbids the use not only of items seized in violation of the guaranties of the fourth amendment but also evidence which stems from their use. Cf. United States ex rel. Foreman v. Casseles, 311 F.Supp. 526, 527 (S.D.N.Y.1970).

■ Numerous cases have recognized confessions or admissions as "fruit" of an illegal search and seizure. Wong Sun v. United States, 371 U.S. 471, 485–487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Ruiz v. Craven, 425 F.2d 235, 236 (9 Cir. 1970); Amador-Gonzalez v. United

---

and 11 a. m., I believe, he was at the office of the Montauk Trailways and that he solicited, to solicit money.

He told me he was refused and he saw a bank deposit bag on a cabinet there, that he took the bag with him when he left and there was checks in the bag, plus currency. He kept the currency and this one check and he destroyed the other checks.

"Q Did he state to you the manner in which he was dressed on that day?

"A Yes, sir. He told me he was dressed as a minister, with a Roman collar.

"Q Did you question him further regarding his being a minister?

"A I did ask him if he was an ordained minister. He informed me that he was but that he did not have any church or congregation.

"MR. BROWNE: You may inquire.

"MR. BRETT: May I approach the bench, if your Honor pleases, for a side-bar conference, with the stenographer?

"THE COURT: Well, all right.

(The following occurred at the bench, out of hearing of the jury.)

"MR. BRETT: I object to the district attorney eliciting from the detective conversations with respect to the clerical garb. It appears to me that your Honor specifically suppressed such statements, in view of the fact that they concern clerical garb and physical evidence which, in and of itself, was suppressed by your Honor.

"THE COURT: Objection is overruled. The decision with respect to the suppression—my statements dealt with the question of those things that were seized illegally. Since they are not offered in evidence, they are not before the jury." (Trial transcript, pp. 65–67.)

Thus, it appears that despite his earlier ruling at the second suppression hearing, the trial judge allowed into evidence admissions by petitioner relating to the clerical garb.

Furthermore, it is unclear from the transcript of the first suppression hearing whether, the first judge did not in fact agree to suppress admissions relating to the check.

7. "Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas."

States, 391 F.2d 308, 318 (5 Cir. 1968); Barnett v. United States, 384 F.2d 848, 862 (5 Cir. 1967); United States v. Nikrasch, 367 F.2d 740, 744 (7 Cir. 1966); Hall v. Warden, 313 F.2d 483 (4 Cir. *en banc*), cert. denied, 374 U.S. 809, 83 S. Ct. 1693, 10 L.Ed.2d 1032 (1963); Takahashi v. United States, 143 F.2d 118, 122 (9 Cir. 1944); Nueslein v. District of Columbia, 73 U.S.App.D.C. 85, 115 F. 2d 690 (1940); cf. Fahy v. Connecticut, 375 U.S. 85, 90, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Verbal evidence which derives so immediately from an unlawful entry or an unauthorized arrest is no less the "fruit" of official illegality than the more common tangible fruits of an unwarranted intrusion. Wong Sun v. United States, *supra*, 371 U.S. at 486, 83 S.Ct. 407.

■ The court is also mindful that the exclusionary rule has been the subject of much controversy and should not be applied mechanistically. See, *e. g.*, Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (Powell, J. concurring). "Courts must neither so narrow the rule as to impair its presumed deterrent effect nor expand it in such a way that in order to achieve a marginal increment in deterrence, society will pay too high a price."

United States v. Friedland, 441 F.2d 855, 861 (2 Cir.), cert. denied, 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971).

■■ The standard for determining the applicability of the exclusionary rule expressed in *Wong Sun* and subsequently followed in numerous cases is whether, granting establishment of the primary illegality, the evidence to which objection was made was obtained by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.[8] Wong Sun v. United States, *supra*, 371 U.S. at 487–488, 83 S.Ct. 407, citing Maguire, Evidence of Guilt, 221 (1959). Thus, if challenged evidence was also obtained from an independent source or if the connection between the illegality and the evidence was so attenuated as to dissipate the taint, its use at trial does not violate constitutional guarantees.

■ Here, it is undisputed that petitioner's automobile was illegally searched and his clerical garb illegally seized. It is also undisputed that when confronted with the garb petitioner confessed to the crime, while being interrogated under police custody. Subsequent questions (as reflected in the transcript of the April suppression hearing) during the same interrogation concerning the check found at the hotel in Brooklyn

8. Not all confessions or admissions are tainted by an earlier or contemporaneous illegal search and seizure. "But, if it be established that there was an unlawful seizure . . . all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality." Takahashi v. United States, *supra*, 143 F.2d at 122. If the evidence seized in the unlawful search "induced" or "triggered" subsequent incriminating statements, "the statements thus affected would be so related to the illegal activity as to be inadmissible." Barnett v. United States, *supra*, 384 F.2d at 862.

The court does not overlook the fact that petitioner had a voluntariness hearing in 1968. Such a hearing would ordinarily adjudicate claims of psychological compulsion. Although the 1968 hearing did not in fact investigate the type of compulsion claimed here, it might be deemed a binding adjudica-

tion of any and all voluntariness issues. But the absence of any arguments that the admitted admissions were "triggered" by excluded evidence and admissions must be viewed as resulting from the New York Court of Appeals earlier ruling to the contrary. Relitigating a point decided by the highest State court would have constituted nothing more than an exercise in futile argumentation. See Young v. State of Maryland, 455 F.2d 679, 685 n. 2 (4 Cir.) (dissent), cert. denied, 407 U.S. 915, 92 S.Ct. 2450, 32 L.Ed.2d 691 (1972), citing People v. Bilderbach, 62 Cal.2d 757, 767, 44 Cal. Rptr. 313, 401 P.2d 921 (1965). In any case, the admissibility of petitioner's admissions is to be determined under fourth amendment, rather than fifth amendment standards. See, *e. g.*, United States v. Fallon, 457 F.2d 15, 19 (10 Cir. 1972); see also W. Ringel, Searches & Seizures, Arrests and Confessions 141–42 (1972).

elicited further admissions, an inseparable sequence clearly stated in the opinion of the Court of Appeals majority.

Petitioner's underlying premise is that he would not have made the admissions as to the check had he not been aware of the illegal search and had he not already made admissions following the discovery of the clerical garb. He notes that there was no other item of evidence tying him to the check or the crime aside from his earlier admissions.

Despite the fact that petitioner's admissions related to different items of evidence, it is impossible on the record to view the check admissions as resulting from an independent lawful source of information or evidence. Cf. Wong Sun v. United States, *supra* at 487. The record clearly demonstrates a continuum of interrogation surrounding the clerical garb and the check. Petitioner's admissions as to the garb effectively laid the foundation for further questioning as to the check. And his admissions as to the latter can only be viewed as logically compelled by his earlier admissions. Compare United States v. Brandon, 467 F.2d 1008 (9 Cir. 1972). In fact, absent the illegal search and seizure there was no basis at all for holding petitioner for seven hours and interrogating him concerning the Montauk Freightways theft.

The court is constrained to conclude, therefore, that petitioner's admissions were the product of an illegal search and seizure and earlier tainted admissions. An evidentiary hearing on petitioner's claim is unnecessary, Townsend v. Sain, *supra*, 372 U.S. .at 318, 83 S.Ct. 745, since the undisputed facts in the record clearly indicate that the State courts improperly allowed petitioner's admissions into evidence in violation of his fourth amendment rights, applicable under the due process clause of the four-·teenth amendment. Compare Amador-Gonzalez v. United States, *supra*, 391 F. 2d at 318, with Barnett v. United States, *supra*, 384 F.2d at 861–862. See, generally, Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579, 607–611 (1968).

Accordingly, petitioner's conviction cannot stand. Ruiz v. Craven, *supra*, 425 F.2d at 236; Amador-Gonzalez v. United States, *supra*, 391 F.2d at 319; United States v. Nikrasch, *supra*, 367 F.2d at 744; Nueslein v. District of Columbia, *supra*, 115 F.2d at 696.

In view of the foregoing conclusion, extended consideration of petitioner's remaining contentions is unnecessary. The right to counsel during police interrogations established in such landmark cases as Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is not retroactive and does not apply to cases tried before June 22, 1964. Johnson v. New Jersey, 384 U.S. 719, 721, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Petitioner's trial took place on April 8 and 9, 1964. Thus his case is governed by earlier law, and "[p]rior to 1964, the refusal of police or other interrogators to permit the subject of interrogation to consult with counsel, even in the face of a specific request to see a particular available lawyer, was regarded as only part of the 'totality of circumstances' determining the voluntariness of a statement." McCormick, Evidence (2d ed.), at 324.

While petitioner claims that the circumstances surrounding his interrogation should invalidate his admissions, he mentions no specific facts in his petition, and appears to be seeking only to reargue the general voluntariness of his statements to the police. The relevant test as to voluntariness in pre-*Escobedo* cases, according to Johnson v. New Jersey, *supra*, 384 U.S. at 730, 86 S.Ct. 1772, is to be found in Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963):

"[T]he question in each case is whether the defendant's will was overborne at the time he confessed," Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922. "In

short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort." Wilson v. United States, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090. See also Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568. And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all the attendant circumstances.

 A close review of the record, in particular the transcript of the *Huntley* hearing, provides no reason for disturbing the trial judge's determination that petitioner's will had not been overborne at the time he made his statements. Petitioner received a full and fair State hearing which dealt completely with general voluntariness, and a federal evidentiary hearing is not required. Townsend v. Sain, *supra,* 372 U.S. at 313, 83 S.Ct. 745, cf. United States ex rel. Johnson v. Department of Correctional Services, 461 F.2d 956, 961 (2 Cir. 1972).[9]

Petitioner also contends that "unreasonable delay in arraignment [is] further support for the inadmissibility of [his] confessions." He argues that the delay is in direct violation of § 165 of the New York Code of Criminal Procedure [10] and the United States Constitution. However, the statements in question were made prior to any delay in arraignment and cannot be attributed thereto. United States ex rel. Candelaria v. Mancusi, 284 F.Supp. 171, 172 (S.D.N.Y.1968); People v. Scully, 4 N.Y.2d 453, 176 N.Y.S.2d 300, 151 N.E.2d 861 (1958).

 In addition, petitioner raises a 14-hour delay between arrest and being formally charged with a crime. Although there is some question as to when exactly the arrest took place, the record is clear that petitioner was booked no more than 11 hours after the policemen first received the dispatch as to the possible holdup in the hotel at 3:00 p. m. In any case, the trial judge found in the *Huntley* hearing that the detention was not unreasonable, relying upon United States v. Vita, 294 F.2d 524 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962). Such a finding was within his discretion. See People v. Briggs, 36 A.D.2d 790, 319 N.Y.S.2d 374 (3d Dept. 1971); People v. Pounds, 35 A.D.2d 969, 317 N.Y.S.2d 884 (2d Dept. 1970).[11]

---

9. The judge clearly disbelieved petitioner's testimony, which was the principal foundation for putting the voluntariness of petitioner's confession into question. This rejection of petitioner's testimony found expression in two places in the judge's memorandum.

> The defendant appeared to be of average intelligence or better when questioned on direct examination, but became evasive and feigned a lack of understanding on cross-examination, particularly when questioned as to his past criminal record. (Decision of February 5, 1968, p. 2.)

> In view of the foregoing and in view of the demonstrated competence and experience of defendant's counsel, who was then on the staff of the Legal Aid Society and whom this Court knows to be an extremely able practitioner of the criminal law, based on the defendant's trial and the numerous other trials conducted by him before this Court, the Court can put no credence in defendant's testimony on this hearing that he never told his counsel of the coercion and promises which he now asserts because counsel "never asked him." (*Id.* at 3–4.)

10. Section 165, which was then in force (now revised in § 120.90 of the Criminal Procedure Law), provides:

> "The defendant must in all cases be taken before the magistrate without unnecessary delay, and he may give bail at any hour of the day or night."

11. The rule established in cases such as McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), rendering inadmissible statements made during a period in which federal officers had failed to comply with a statutory directive does not govern this State case. The Supreme Court itself has characterized the rule as an exercise of

Therefore, the court again defers to the trial judge's findings. Townsend v. Sain, *supra*, 372 U.S. at 318, 83 S.Ct. 745.

It follows that the petition for a writ of habeas corpus must be, and it is granted. Petitioner will be released from custody unless the State, within thirty (30) days, grants him a new trial.

So ordered.

its supervisory power rather than a holding of constitutional dimensions. Culombe v. Connecticut, 367 U.S. 568, 599–602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).